**Howard I. LUKENS, Petitioner–**
**Appellant,**

v.

**COMMISSIONER OF INTERNAL**
**REVENUE, Respondent–**
**Appellee.**

**No. 91–4027.**

United States Court of Appeals,
Fifth Circuit.

Oct. 7, 1991.

Edward G. Lavery, Larry K. Hercules, Hercules, & Hampton, Dallas, Tex., for petitioner-appellant.

Kevin M. Brown, Gary Allen, Chief Appellate, U.S. Dept. of Justice, David E. Carmack, Shirley D. Peterson, Asst. Atty. Gen., Tax Div., Washington, D.C., for respondent-appellee.

Before KING, JOHNSON and EMILIO M. GARZA, Circuit Judges.

KING, Circuit Judge:

Taxpayer Howard I. Lukens appeals from a ruling by the tax court disallowing interest deductions based on its finding that Lukens' investment in timeshare units did not constitute genuine indebtedness. Lukens' contentions with regard to this finding focus on the tax court's method of valuation of the property. Lukens also contests the tax court's ruling that he is liable for penalty interest payments under 26 U.S.C. § 6621(c) because his tax deficiency was a substantial underpayment attributable to the timeshare purchase transaction. Finding no error in the judgment of the tax court, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

The facts in the instant case are discussed in full in the opinion of the tax court, at *Ames v. Commissioner*, 58 T.C.M. (CCH) 1470 (1990). In *Ames*, this case was consolidated for trial, briefing, and opinion with six other cases involving similar issues.[1] For the sake of economy we will set forth only those facts necessary to the determination of Lukens' appeal.

On December 21, 1981, Lukens and seventeen other individuals formed Univestors in Utah, a Utah partnership ("Univestors" or "partnership"). The purpose of Univestors, in which Lukens had a 4.6% interest, was to purchase timeshare units in vacation homes in Park City, Utah.[2] On De-

1. Petitioners in the six other cases resided outside of this circuit at the time they filed their petitions, and accordingly, appellate venue lies elsewhere as to them. 26 U.S.C. § 7482(b)(1)(A).

2. The timesharing process in this matter deserves some description. The tax court found the following facts. Kilburn Vacation Homeshares, Inc. ("Kilburn") owned 52 vacation homes in the Park City area, which it converted to timeshares. The original timeshare plan was as follows. Each home was divided into 350 days. The remaining 15 days were reserved by Kilburn for maintenance and cleaning. Kilburn sold the available 350 days, known as timeshare units, through dealers, to prospective purchasers. Each purchaser was to receive a 1/350 undivided fee simple interest in the home as a tenant-in-common with all the other purchasers of the timeshare units, and a share of the furniture and personal property in the unit. By the use of restrictive covenants, each purchaser's use of the property was restricted to one day per year. If a purchaser purchased a block of timeshares, the days assigned to those timeshares would then be rotated as a block.

Concurrently with the purchase of a timeshare unit, by virtue of a covenant, the purchaser became a member of the owners' association organized for each vacation home. The owners' association also held a power of attorney for each purchaser and could use it to sell the purchaser's timeshare unit. The owners' association was managed by a Board of Trustees, elected by the members. Kilburn initially controlled the Board of Trustees of the owners' associations.

By an amendment to a real estate contract dated September 29, 1983, Kilburn changed each timeshare owner's interest in the vacation home from that of tenant-in-common to that of licensee under a 99-year floating license. The stated reason for the change was that many of the purchasers had defaulted on their contracts resulting in substantially less money being paid to Kilburn in the form of interest payments. The amendment to the original real estate contract provided that Kilburn had acquired, or would acquire, the right, title, and interest of the seller in the contract. The timeshare owners were to exchange their 1/350 undivided interest as tenants-in-common for new timeshare units defined as "a license and privilege to occupy and use one of the dwellings ... for a period of one day per calendar year on a date ... specified by Kilburn...."

The term of payment for the new timeshare units would be 45 years. The final date of payment, however, was to fluctuate in accordance with a formula tied to the prime rate of interest as reported in the Wall Street Journal. The deduction ratio under the amendment was reduced from 8:1, *see* Section II C, Infra to 6:1, *i.e.*, a six-dollar deduction for each dollar actually invested.

cember 29, 1981, Univestors purchased twenty-seven timeshare units in a tri-level house, identified as Lot # 1033, Jeremy Ranch Plat B ("House # 30"). The purchase price of each timeshare unit was $3,600. For each unit, the partnership paid a down payment of $800, which left an unpaid principal balance of $2,800. The partnership was to pay $570 per unit per year for ten years, which payments were to be applied to interest. No further principal or interest payments were required until thirty years from the purchase date. At that time, because the debt was nonrecourse, the partnership could either forfeit its interest in the unit or make a balloon payment of approximately $86,700 to become the owner.[3]

On his federal income tax return for 1981, Lukens claimed a $7,179.54 deduction, as his proportional share of the partnership's loss, for his $993.60 (4.6% of the $21,600 total down payment for the 27 units) expenditure on December 29, 1981.[4] On June 17, 1985, the Commissioner issued a statutory deficiency notice to Lukens determining a $2,953 deficiency in Lukens' federal income taxes for 1981 and completely disallowing the deduction. The Commissioner determined also that Lukens

was liable for an increased rate of interest under 26 U.S.C. § 6621(c).

On September 19, 1985, October 15, 1985, and January 23, 1986, Lukens filed a petition, amended petition, and second amended petition, respectively, in the tax court challenging the Commissioner's findings. He argued that the timeshare units were worth the purchase price, and because the value of the units would appreciate during the life of the contract, purchase of them was a sound business investment. At trial, the parties proffered the testimony of experts to aid the tax court in its determination of the fair market value of the timeshare units purchased by Univestors. Lukens elicited the testimony of two expert witnesses: Clyde E. Williams concluded that the appraised value for each timeshare unit in House # 30 was $3,950; Kathleen Conroy appraised each unit at $2,920. The Commissioner's expert, Michael Greene, testified that the value of each timeshare unit in House # 30 was $1,200.[5] At trial, Lukens also sought to elicit the testimony of Francis Longstaff as an expert witness. Longstaff was to testify as to the expected appreciation in value of each timeshare unit. The tax court, however, concluded that Longstaff did not qualify as an expert, but allowed him to testify as a fact witness

---

It appears from the record that, at least as of September 29, 1983, the owners' association were controlled by Kilburn. Approximately 50% of those who owned timeshares in 1983 refused to sign the amendment. If the timeshare unit owned was designated to be in a house that Kilburn wished to sell, Kilburn sold its underlying interest in the house and the owners' association sold the timeshare owner's interest in the house as the owner's attorney-in-

fact. Thus, those timeshare unit purchasers who thought they had purchased a fee simple interest in property had the alleged interest sold out from under them by the owners' association.

3. The following is a summary of the purchase price, down payment, and financing charges relative to Univestors' purchase of each unit in House # 30:

| Purchase Price | Down Payment | Balance | Annual Payment | Balloon Payment |
|---|---|---|---|---|
| $3,600 | $800 | $2,800 | $570 | $86,700 |

4. The following is a summary of Lukens' share of the partnership's costs of the total timeshare purchasing transaction:

| Purchase Price | Down Payment | Balance | Annual Payment | Balloon Payment |
|---|---|---|---|---|
| $4,471.20 | $993.60 | $3477.60 | $707.94 | $114,760.80 |

5. Greene first determined the value of a one-day timeshare as of 1986, and then adjusted the 1986 value to reflect the 1981 purchase date of the property. Greene made this adjustment by reducing the value in an amount equal to the change in the consumer price index over the same period of time. We agree with the tax court that this method is "incredible" and not worthy of consideration by the court. *Ames*, 58 T.C.M. at 1487.

and admitted his written reports into evidence.

The tax court, after hearing the expert testimony, selected from the various methods of valuing the timeshare units proffered by all of the experts to arrive at its conclusion that each timeshare unit in House # 30 had a fair market value of $919, far lower than the purchase price of $3,600. The tax court further found each unit would not appreciate to the point where its market value would equal or exceed the balloon payment due in the thirtieth year after purchase, and that, because the financing was nonrecourse, Lukens would forfeit his interest in each unit in lieu of making the balloon payment.

Based on these findings, the tax court determined that the nonrecourse debt incurred by the partnership in the acquisition of the units did not constitute genuine debt and, consequently, did not give rise to interest deductions. The court also imposed an increased rate of interest, with respect to the transaction, under section 6621(c) of the Internal Revenue Code based on Lukens' "substantial underpayment" of tax attributable to a tax motivated transaction. 26 U.S.C. § 6621(c).

## II. DISCUSSION

Lukens contends that the tax court erred by (i) valuing the timeshare units lower than any of the three expert witnesses; (ii) refusing to allow, or disregarding, all expert witness testimony as to likely appreciation rates; (iii) finding that the nonrecourse debt lacked economic substance; (iv) completely disallowing the claimed interest deduction; and (v) imposing an increased rate of interest under 26 U.S.C. § 6621(c). We will address these issues seriatim.

### A. Expert Testimony as to Value of Timeshare Units

Lukens contends that the tax court improperly ignored all expert testimony proffered by both parties in valuing the timeshare units. The valuation of the units by the tax court, complains Lukens, was lower than expert valuations, including that of the Commissioner's expert.

■ The tax court's determination of the fair market value of the timeshare units is a finding of fact reviewable under the clearly erroneous standard. *Morris v. Commissioner*, 761 F.2d 1195, 1200 (6th Cir.1985) ("determination of the fair market value of certain property ... is a factual one and should not be reversed on appeal unless clearly erroneous"); *see also Masat v. Commissioner*, 784 F.2d 573, 575 (5th Cir.1986); *Curtis v. Commissioner*, 623 F.2d 1047, 1050–51 (5th Cir.1980). The court is free either to accept or reject expert testimony in accordance with its own judgment. *See Helvering v. National Grocery Co.*, 304 U.S. 282, 295, 58 S.Ct. 932, 938, 82 L.Ed. 1346 (1938); *Tripp v. Commissioner*, 337 F.2d 432 (7th Cir.1964); *Estate of Kreis v. Commissioner*, 227 F.2d 753, 755 (6th Cir.1955); *Parker v. Commissioner*, 86 T.C. 547, 562 (1986) (the tax court need not accept any expert testimony that does not withstand careful analysis). In fact, the court is not in any way bound by the opinions or formulas proffered by experts, and may reach a determination of value based upon its own evaluation of the evidence in the record. *Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir.1976), *cert. denied*, 431 U.S. 938, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977); *In re Williams' Estate*, 256 F.2d 217, 219 (9th Cir.1958) ("the trier of fact ... may disregard [expert opinion] altogether in decision"). As this court has noted, "[v]aluation is ... necessarily an approximation.... It is not necessary that the value arrived at by the trial court be a figure as to which there is specific testimony, if it is within the range of figures that may properly be deduced from the evidence." *Anderson v. Commissioner*, 250 F.2d 242, 249 (5th Cir.1957), *cert. denied*, 356 U.S. 950, 78 S.Ct. 915, 2 L.Ed.2d 844 (1958); *see also Archer v. Commissioner*, 227 F.2d 270, 273 (5th Cir. 1955).

■ The tax court had the opportunity to hear and evaluate the credibility of both parties' expert witnesses. The tax court devoted a considerable portion of its opinion to in-depth discussion of each expert's

valuation methods. The tax court found most of the testimony suspect, and fashioned its own valuation from what credible testimony was proffered. The tax court's valuation of $919 for each timeshare unit was "within the range of figures that may properly be deduced from the evidence," *Anderson*, 250 F.2d at 249, and was therefore not clearly erroneous.

### B. *Expert Testimony as to Appreciation*

Lukens also contends that the tax court erred in refusing to allow expert testimony from Longstaff regarding appreciation. This contention is without merit. Longstaff was allowed to testify as a fact witness, and two reports he prepared concerning appreciation of the timeshare units were admitted into evidence. Inasmuch as Longstaff was pursuing a B.A. in accounting and studying for his C.P.A. examination during the time he was writing the two reports, the tax court did not abuse its discretion in refusing to admit his testimony as expert.

Lukens also argues that the tax court erred in disregarding "admissions" by the government's expert witness, Dr. Hoag, regarding the inflation rate, when it found that the timeshares would never appreciate to a value comparable to the final balloon payment. As we noted above, the tax court is free to accept or reject expert testimony in accordance with its own judgment. *Helvering*, 304 U.S. at 295, 58 S.Ct. at 938; *Estate of Kreis*, 227 F.2d at 755. The tax court committed no clear error in disregarding Dr. Hoag's testimony.

### C. *"Sham" Transaction*

 The tax court's determination that the transaction was a "sham" is a finding of fact, and therefore reviewable under the clearly erroneous standard. *See Masat*, 784 F.2d at 575; *Curtis*, 623 F.2d at 1050–51. According to the tax court, "[t]he motivating factor in th[is] case[ ] was the extravagant tax write-off petitioners received

as compared to their cash outlay. Without the tax write-offs, petitioners would have received no benefit from the purchase of the timeshares." *Ames*, 58 T.C.M. at 1491. The court also noted that Lukens would have received a deduction of $8 for each $1 actually invested. The tax court found further that each timeshare unit would not have appreciated enough in value over thirty years to induce Lukens to pay the final $89,600 balloon payment.

We find that the tax court did not clearly err in finding that the transaction in question lacked economic substance and constituted a "sham."

### D. *Complete Disallowance of Deductions*

The tax court completely disallowed Lukens' interest deductions after finding that the nonrecourse notes lacked economic substance. *Ames*, 58 T.C.M. at 1491. Lukens contends that the tax court erred as a matter of law because it failed to allow an interest deduction to the extent of the value of the timeshare units under the reasoning of *Pleasant Summit Land Corp. v. Commissioner*, 863 F.2d 263 (3d Cir.1988), *cert. denied*, 493 U.S. 901, 110 S.Ct. 260, 107 L.Ed.2d 210 (1989).[6] We disagree.

 This court reviews that tax court's interpretation of the Code *de novo*. *San Antonio Savings Ass'n v. Commissioner*, 887 F.2d 577, 581 (5th Cir.1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 1618, 113 L.Ed.2d 716 (1991). Section 163(a) of the Code provides for the deduction of "all interest paid or accrued within the taxable year on indebtedness." 26 U.S.C. § 163(a). It is well settled that interest is deductible only if paid with respect to genuine indebtedness. *See Knetsch v. United States*, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960); *Durkin v. Commissioner*, 872 F.2d 1271, 1278 (7th Cir.), *cert. denied*, 493 U.S. 824, 110 S.Ct. 84, 107 L.Ed.2d 50 (1989). Other courts of appeals have disallowed all interest deductions where the nonrecourse debt was found not to be genuine. *See, e.g.,*

---

**6.** We note that Lukens never brought the issue of his potential entitlement to partial interest deductions to the attention of the tax court.

However, it was addressed by the tax court and it has been briefed by the Commissioner. We therefore address it.

*Lebowitz v. Commissioner*, 917 F.2d 1314, 1318–19 (2d Cir.1990) (disagreeing with the holding of *Pleasant Summit* ); *Odend'hal v. Commissioner*, 748 F.2d 908, 912 (4th Cir.1984), *cert. denied*, 471 U.S. 1143, 105 S.Ct. 3552, 86 L.Ed.2d 706 (1985); *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1049 (9th Cir.1976). As the Ninth Circuit explained,

> [t]o justify the deduction the debt must exist; potential existence will not do. For debt to exist, the purchaser, in the absence of personal liability, must confront a situation in which it is presently reasonable from an economic point of view for him to make a capital investment in the amount of the unpaid purchase price.

*Estate of Franklin*, 544 F.2d at 1049. In transactions where the amount of nonrecourse debt bears no reasonable relationship to the value of the collateral securing repayment of the debt, it is very unlikely that the obligation will ever be paid. The debtor has no economic incentive to satisfy the obligation when the only consequence of his default is forfeiture of collateral worth far less than the amount of nonrecourse debt. *See id.* at 1048; *Odend'hal*, 748 F.2d at 912. Several courts have held that such indebtedness should not be recognized because of the unlikelihood of payment of the obligation. *See, e.g., Estate of Isaacson v. Commissioner*, 860 F.2d 55, 56 (2d Cir.1988); *Brannen v. Commissioner*, 722 F.2d 695, 701 (11th Cir.1984).

In *Pleasant Summit*, which Lukens would have us follow, the Third Circuit disagreed with the reasoning of *Estate of Franklin*. The court in *Pleasant Summit* noted that while a taxpayer holding property subject to a nonrecourse debt in excess of the market value of the property may have no incentive to pay off any portion of the debt, "it is equally logical to recognize that the creditor holding the debt has no incentive to take back the property if the taxpayer offers to pay the debt up to the

value of the property." 863 F.2d at 276. For example,

> if a creditor held a nonrecourse debt for $1,500,000 on a property with a fair market value of $1,000,000, he would have a disincentive to foreclose if his defaulting debtor offered to settle the debt for not less than $1,000,000. Thus, it is appropriate to disregard only the portion of nonrecourse debt in excess of the fair market value of the property when it was acquired for purposes of calculations of the depreciation and interest deductions and to regard the nonrecourse debt as genuine indebtedness to the extent it is not disregarded.

*Id.* at 276–77.

Even if we were to accept the reasoning in *Pleasant Summit*, it would be relevant only to certain debtor-creditor relationships. For example, a creditor holding a nonrecourse loan secured by an apartment building, who has no wish to manage or maintain the collateral, has clear incentive to settle the debt at its market value in order to avoid the consequences of foreclosing on the collateral. Likewise, the debtor holding such collateral has incentive to make a compromise settlement of the debt up to the value of the collateral in order to keep the property.[7] The reasoning in *Pleasant Summit*, however, would not help Lukens in the instant case. The timeshare units, especially following the amendment turning the interests in the units from tenancies-in-common into licenses, *see supra* note 2, are of dubious utility. The inflated payments made by Lukens purchased, in essence, an opportunity to take disproportionately large tax deductions. The analysis undertaken by the Third Circuit in *Pleasant Summit* is of doubtful relevance when dealing with collateral like that at issue here.

■ We therefore reject Lukens' invitation to embark on the course set by *Pleasant Summit*, and prefer instead to embrace the position of the Ninth Circuit in

7. On the other hand, in tax-minded deals such as seller-financed, sale-leaseback transactions, the nominal buyer/debtor may have no interest in paying to keep the property. *See* Daniel N. Shaviro, *Risk and Accrual: The Tax Treatment of Nonrecourse Debt*, 44 Tax L.Rev. 401, 449 n. 171 (1989).

*Estate of Franklin,* which has been accepted by the Second and Fourth Circuits. The proper inquiry in this situation, as recognized in *Estate of Franklin,* is not whether the seller/creditor has an incentive to settle the debt at the fair market value of the collateral, but whether it would be reasonable for the buyer/debtor to make a capital investment in the unpaid purchase price. *Accord Lebowitz,* 917 F.2d at 1319.

We agree with the tax court that Lukens has no incentive ever to pay the obligation. Lukens' share of the partnership's acquisition costs of the timeshare units was as follows:

| Down Payment | Balance | Annual Payment | Balloon Payment |
|---|---|---|---|
| $933.60 | $3,477.60 | $707.94 | $114,760.80 |

---

After the first year, Lukens had already paid $1,701.54 ($993.60 down payment plus $707.94 annual payment) for the units, far more than his share ($1,141.40) of the fair market value of the property. The structuring of the financing effectively prohibited Lukens from paying off his debt early. For him to have done so, he would have had to pay $10,657.16 (accrued interest and principal of his share of partnership debt) at the close of 1981 and $16,889.46 at the close of 1982. As the Commissioner correctly points out, it would be absurd for Lukens to pay off $16,889.46 in 1982 in nonrecourse debt on property worth only $1,141.40 the previous year. As the tax court recognized, this disparity between fair market value and the payoff amount would continue throughout the life of the loan; the partnership would always have negative equity because the payoff amount would always exceed fair market value of the property.

We agree with the tax court that the nonrecourse debt lacks economic substance, and that any interest deduction thereon should be disallowed completely.

E. *Additional Interest Under § 6621(c)*

■ Section 6621(c) of the Code provides for an increased rate of interest (120%) [8] if

there is a "substantial underpayment" of tax attributable to a tax motivated transaction. A "substantial underpayment" is defined as an underpayment in excess of $1,000 in any year attributable to one or more tax motivated transactions. 26 U.S.C. § 6621(c)(2). Lukens' underpayment totaled $2,953 for taxable year 1981, clearly a "substantial underpayment."

Tax motivated transactions include "sham or fraudulent transactions[s]." 26 U.S.C. § 6621(c)(3)(A)(v).[9] A sham or fraudulent transaction includes transactions that were not entered into for profit and are without economic substance. *Patin v. Commissioner,* 88 T.C. 1086 (1987), *aff'd without opinion sub nom. Hatheway v. Commissioner,* 856 F.2d 186 (4th Cir. 1988), *and aff'd sub nom. Skeen v. Commissioner,* 864 F.2d 93 (9th Cir.1989), *and aff'd sub nom. Gomberg v. Commissioner,* 868 F.2d 865 (6th Cir.1989).

Lukens contends that the tax court should have considered his intent when determining whether he engaged in the transaction for profit. *See ·Heasley v. Commissioner,* 902 F.2d 380, 386 (5th Cir.1990). The tax court did, however, consider the issue of Lukens' intent. According to the tax court,

**8.** The interest rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to that date. *Solowiejczyk v. Commissioner,* 85 T.C. 552 (1985), *aff'd without opinion,* 795 F.2d 1005 (2nd Cir. 1986).

**9.** Other tax motivated transactions include (i) any valuation overstatement of 150 percent or more, (ii) any activity with respect to which a loss or an investment tax credit is disallowed by reason of the at-risk rules, (iii) any tax straddle, and (iv) the use of any accounting method specified in regulations potentially resulting in a substantial distortion of income. 26 U.S.C. § 6621(c)(3)(A).

after examining the objective facts, we find that the individual petitioners did not have a profit objective, independent of tax savings. Rent received from the timeshares was negligible. Vacancies were abundant. Even the promotional materials stated that profit would come from appreciation, not income.

. . . . .

The motivating factor in these cases was the extravagant tax write-off petitioners received as compared to their cash outlay. Without the tax write-offs, petitioners would have received no benefit from the purchase of the timeshares. *Ames*, 58 T.C.M. at 1491; *cf. Skeen*, 864 F.2d at 96. The tax court found that the petitioner lacked a profit objective and that the nonrecourse note lacked economic substance. Based on the facts before us, we cannot find that determination to be clearly erroneous. Because the tax court's determination that the transaction was a sham was not clearly erroneous, application of the section 6621(c) penalty interest rate by the tax court was proper.

### III. CONCLUSION

The judgment of the tax court is, in all respects, AFFIRMED.