DONALD L. GOULD, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gould v. Commissioner
Docket No. 35362-84
United States Tax Court
T.C. Memo 1994-236; 1994 Tax Ct. Memo LEXIS 239; 67 T.C.M. (CCH) 3013; May 26, 1994, Filed *239 For petitioner: George W. Connelly, Jr. and Ruth E. Salek. For respondent: Marion T. Robus. DAWSON, POWELL DAWSON
MEMORANDUM OPINION DAWSON, Judge: This case was assigned to Special Trial Judge Carleton D. Powell pursuant to section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE POWELL, Special Trial Judge: By notice of deficiency dated August 17, 1984, respondent determined a deficiency in petitioner's Federal income tax and an addition to tax as follows: Addition to Tax Year
Deficiency
Sec. 6653(a)
1980
$ 89,428.67
$ 4,471.43
In a First Amendment to Answer, respondent also raised the issue whether the deficiency for 1980 was a substantial underpayment due to tax-motivated *240 transactions and whether the increased rate of interest under section 6621(c) was applicable. At the time the petition was timely filed petitioner resided in Houston, Texas. The issues are: (1) Whether the increased interest provisions of section 6621(c) apply; and (2) whether petitioner is liable for the addition to tax under section 6653(a). The facts may be summarized as follows. The deficiency in this case results from the disallowance of a loss in the amount of $ 145,484. The loss arises from alleged straddle transactions of forward contracts for Government-backed financial securities with First Western Government Securities, Inc. (First Western). The First Western losses were the subject of this Court's opinion in Freytag v. Commissioner, 89 T.C. 849 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on other grounds 501 U.S. 868 (1991). After a lengthy trial, this Court found, based on that record, inter alia, that "The transactions between First Western and its customers were illusory and fictitious and not bona fide transactions." Id. at 875. This Court *241 alternatively held that, even if the transactions had substance, they "were entered into primarily, if not solely, for tax-avoidance purposes." Id. at 876. Based on the finding that the transactions were not bona fide, this Court concluded that additional interest under section 6621(c) was due on the underpayments. Id. at 886-887. In concluding that the transactions were not bona fide, this Court examined various aspects of the First Western program, including the risk of profit and loss, the hedging operation, the margins required and fees charged, the pricing of the forward contracts that were involved, and the manner in which the transactions were closed. In all of these areas we found that the First Western operations were deficient and not conducted as they should have been if bona fide financial transactions were being conducted. With respect to the losses, this Court noted: Petitioners' portfolios were constructed so as to achieve their desired tax losses. In this regard, the most important required data supplied by petitioners were their requested tax losses. Indeed, the program could not be implemented *242 without the tax information. Thus, in analyzing the program from a profit standpoint, from the first, the tax tail wagged an economic dog. * * * [Id. at 878.]
We also pointed out that there were other "gremlins" in First Western's world that dispelled the notion that these transactions were bottomed in financial reality -- reversing transactions months later, confirmations being months late, and transactions being made with no documentation. Id. at 882. In the case currently before the Court, petitioner concedes that the transactions with First Western were conducted in the same way as the transactions discussed in Freytag; i.e., the same pricing algorithms were used and the transactions were closed in the same way. He does not contest the disallowance of the losses claimed. He does, however, contest the increased interest under section 6621(c) and the addition to tax for negligence under section 6653(a). Petitioner has an undergraduate degree and a law degree from the University of Texas. He has not practiced law, but rather has been in the insurance business. In 1980, he was employed by Georgia International *243 Life Insurance Co. (Georgia International), and also ran his own insurance business that he operated as a sole proprietorship. Petitioner's compensation from Georgia International and the business totaled $ 214,385. For 1980, $ 13,255.09 in Federal income tax was withheld from his wages by Georgia International. Petitioner did not make any estimated tax payment. Petitioner was introduced into First Western's world by a friend named Bill Loesch (Loesch), whom petitioner described as a very successful businessman. There is no indication, however, that Loesch had any particular expertise in financial markets. Loesch apparently had become involved with First Western through his accountant, Robert B. Westendarp (Westendarp), whose primary business was preparing tax returns. Westendarp was a "finder" for First Western and received a percentage of any fees that were paid to First Western by people referred to First Western by him. Petitioner contacted Westendarp and received a brochure concerning the First Western program. Petitioner took the information to his accountant, Larry P. Ross (Ross). Ross had worked as an Internal Revenue Service agent and as an accountant with Touche *244 Ross. He also has a law degree. Ross had attended a 2-hour First Western presentation and thought that the program was a "suitable" investment for petitioner. In his discussion with Ross, petitioner's "main" interest was the tax aspects. Petitioner knew that the tax loss in 1980 was "part of the deal". Ross did not get into the details and made no independent investigation of the program. Petitioner did not seek investment advice from Ross. Petitioner also sought advice from an associate, whose name he could not remember, working at Touche Ross. There is no indication that he actually hired Touche Ross to investigate and give an opinion on the substance of the First Western program. He was advised that the program "had a potential of making money" and that the tax advantages were "legitimate". Petitioner did not know what, if any, investigation was done by the associate, and, while he thought that the associate had some expertise, he did not know whether the associate had any special knowledge concerning securities transactions. Petitioner, through Westendarp, executed a standard First Western Customer's Agreement and sent First Western a check for $ 22,500 on December *245 3, 1980. The records of First Western show that petitioner requested a "tax preference" of an ordinary loss for the taxable year 1980 in the amount of $ 150,000 and a long-term capital gain in the same amount for the taxable year 1982. The $ 22,500 is 15 percent of the tax preference. On December 8, 1980, First Western sent petitioner a suggested portfolio. The attached letter stated that "Unless you advise us otherwise by 1:00 PM EST on December 12, 1980, we will execute the required trades at that time at the prices current on that date." Notwithstanding that date, First Western executed alleged transactions involving $ 14.1 million on December 10, 1980. On December 11, 1980, First Western "cancelled" a $ 7.4 million leg of the straddle with an alleged loss in the amount of $ 145,484 that petitioner deducted on his 1980 Federal income tax return. On December 22, 1980, First Western made other trades. The only other activity in petitioner's account was that the interest rate forecast was changed on July 24, 1981, by Westendarp, and the other forward contracts were "assigned" to Ionian Finance, Ltd. on March 15, 1982. On December 31, 1982, the account was closed and First Western *246 sent petitioner a check in the amount of $ 7,454. After the initial contact with Westendarp, there is no evidence that petitioner communicated with First Western or Westendarp. Westendarp had no independent recollection of petitioner and/or petitioner's transactions with First Western. Petitioner did not understand the mechanics of the First Western program, and there is nothing in the record to suggest that he even attempted to have the mechanics explained to him. He did not know the meaning of "assignment" and "cancellation" as used by First Western. He did not know how to, or attempt to, verify the prices on the transactions, and he did not read the statements that he received from First Western. Petitioner filed his 1980 Federal income tax return in October 1981. Prior to filing that return, petitioner read an article in the Wall Street Journal that discussed tax straddles which pointed out that the "Risks Are High". The article caused him to "think" about his transactions with First Western. On September 8, 1981, First Western sent petitioner a letter which advised that the law had been changed and that he should review his portfolio with his tax adviser. There is no *247 indication that he sought any such advice. 1. Section 6621(c)
Petitioner contends that the increased interest under section 6621(c) is inapplicable to him, relying on Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408. Section 6621(c)(1) provides that, if there is a "substantial underpayment attributable to tax motivated transactions," the interest payable under section 6601 "shall be 120 percent of the underpayment rate". A substantial underpayment attributable to a tax-motivated transaction means "any underpayment of taxes * * * attributable to 1 or more tax-motivated transactions if the amount of the underpayment for such year * * * exceeds $ 1,000." Sec. 6621(c)(2). The term "tax motivated transactions" means, inter alia, "any sham or fraudulent transaction." Sec. 6621(c)(3)(v). From a literal reading of the statute, if a transaction is determined to be a "sham", the increased interest applies. In Freytag v. Commissioner, 89 T.C. 849, 887 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on other grounds 501 U.S. 868 (1991), *248 we sustained respondent's determinations that section 6621(c) applied to the First Western underpayments based on our finding that the transactions were "shams". Because petitioner concedes that his transactions with First Western were identical to those in Freytag, additional interest under section 6621(c) is applicable here. See Howard v. Commissioner, 931 F.2d 578, 582 (9th Cir. 1991), affg. T.C. Memo. 1988-531. In Heasley v. Commissioner, T.C. Memo. 1988-408, this Court found that the transactions were not entered into for profit, and, therefore, under section 301.6621-2T Q&A-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984), the increased interest under section 6621(c) was applicable. The Court of Appeals for the Fifth Circuit concluded, however, that the taxpayers had "the requisite profit motive." Heasley v. Commissioner, 902 F.2d at 386. While it is true that in Freytag v. Commissioner, 89 T.C. at 882-886, we held, in the alternative, that the transactions were not entered *249 into for profit, we sustained the additional interest under section 6621(c) on the ground that the alleged transactions factually were illusory and fictitious, i.e., "shams", a finding affirmed by the Court of Appeals for the Fifth Circuit in Freytag v. Commissioner, 904 F.2d at 1015-1016, and it is upon that ground that we sustain respondent's determination here. Petitioner, however, contends that for a transaction to be considered a sham under section 6621(c)(3)(v), the transaction must be without economic substance and be entered into without a profit objective, citing Heasley v. Commissioner, supra. While, as discussed infra, we reject his contention that there was a profit motive, we do not read the Court of Appeals' opinion in Heasley nor its opinion in Lukens v. Commissioner, 945 F.2d 92, 99-100 (5th Cir. 1991), affg. Ames v. Commissioner, T.C. Memo. 1990-87, to stand for this proposition. When a transaction is the simple product of smoke and mirrors, it is a factual sham, regardless of whether the taxpayer may have thought that a profit could have been made. See Cherin v. Commissioner, 89 T.C. 986, 993-994 (1987). *250 This is all that section 6621(c)(3)(v) requires. See Statement of the Managers attached to the conference report, H. Conf. Rept. 99-841, at II-796 (1986), 1986-3 C.B. (Vol. 4) 1, 796. Thus, Heasley v. Commissioner, supra, is inapposite. 2. Negligence
Respondent determined an addition to tax for negligence under section 6653(a). Section 6653(a) provides in relevant part that "If any part of any underpayment * * * is due to negligence or intentional disregard of rules and regulations * * * there shall be added to the tax an amount equal to 5 percent of the underpayment." "'Negligence is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Freytag v. Commissioner, 89 T.C. at 887 (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. on this issue 43 T.C. 168 (1964)); see also Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982). Petitioner has the burden of establishing that *251 his actions were not negligent. See Freytag v. Commissioner, 904 F.2d at 1017. Petitioner contends that the addition to tax under section 6653(a) is unwarranted. The gravamens of his contention are that he relied on expert advice and that his motive for entering into the transactions was not to avoid taxes. With regard to petitioner's reliance on experts, such reliance, standing alone, will not insulate a taxpayer from the addition to tax for negligence. It must be shown that the expert had the expertise and knowledge of the pertinent facts to render such an opinion on the subject matter. Freytag v. Commissioner, 89 T.C. at 888. Furthermore, it must be established that the person rendering the advice was independent and did not have an economic interest in giving the advice. Rybak v. Commissioner, 91 T.C. 524, 565 (1988). Petitioner has a background in the insurance industry. Prior to 1980, he had made no investments in any transactions of this nature. He was told about the First Western program by Loesch, who had no expertise in dealing with straddles in forward contracts that *252 were the heart of the First Western program. He claims to have relied on Ross. But Ross did not profess to have any expertise in this area. He also claims to have relied on some unknown associate at Touche Ross, but there is no indication that person was qualified to evaluate the program and/or, in fact, did so. When the chaff is stripped away, petitioner essentially relied on the promoter's statements concerning the bona fides of these transactions. In the final analysis, our words in Rybak v. Commissioner, supra at 565, explain the situation: In these circumstances, petitioners did not rely on competent, independent parties; they did no more than inquire of the promoter if the investment was sound. Such reliance is not the type of activity which will overcome the addition to tax for negligence or intentional disregard of the rules and regulations. [Citation omitted.]
See also Marine v. Commissioner, 92 T.C. 958, 992 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); Patin v. Commissioner, 88 T.C. 1086, 1130 (1987), affd. without *253 published opinion 865 F.2d 1264 (5th Cir. 1989), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). It is noted that these transactions could hardly be described as being run-of-the-mill, and petitioner admits that he did not understand the transactions. They involved alleged forward contracts to purchase and sell millions of dollars of mortgage-backed securities. See Freytag v. Commissioner, 89 T.C. at 862-863. There was no market for these contracts, and First Western was on both sides of the transactions. In discussing the First Western transactions, the Court of Appeals for the Fifth Circuit noted: "'no reasonable investor would surrender total control of his or her ability to profit and lose unless satisfied that the risk of loss had been greatly diminished or eliminated.'" Freytag v. Commissioner, 904 F.2d at 1016 *254 (quoting Sochin v. Commissioner, 843 F.2d 351, 356 (9th Cir. 1988), affg. Brown v. Commissioner, 85 T.C. 968 (1985)). Furthermore, the ratio of the tax losses compared with the payments was huge, between 6:1 and 10:1, depending on how it is calculated. This latter fact was particularly important because, as the Court of Appeals for the Ninth Circuit recognized in Zmuda v. Commissioner, 731 F.2d at 1422, during this period there was "extensive continuing press coverage of questionable tax shelter plans." Petitioner was well aware of this from the article he read in the Wall Street Journal. As we noted in our opinion in Freytag v. Commissioner, 89 T.C. at 888, given this scenario, a taxpayer could not merely rely on the documents supplied by First Western, and further investigation was clearly mandated. If there had been any serious examination of the program, "'No reasonable person would have expected * * * [the] scheme to work.'" Freytag v. Commissioner, 89 T.C. at 889; cf. Hanson v. Commissioner, 696 F.2d 1232, 1234 (9th Cir. 1983), *255 affg. per curiam T.C. Memo. 1981-675. Finally, we note that petitioner's alleged profit motive for the First Western transactions is simply cut from whole cloth. The raison d'etre of the program was to convert ordinary income into long-term capital gains and defer the payment of taxes. Petitioner was clearly aware of this. Indeed, according to Ross, his "main" concern was the tax aspects. Petitioner, however, steadfastly contends that he did not know about the request for tax losses that was supplied to First Western. This has a decidedly hollow ring. If we were to accept petitioner's argument, we would have to accept that the request for a tax loss, which was well tailored to his situation, materialized out of thin air. We decline that invitation. It is highly unlikely that anyone whose primary purpose was to make a profit would enter into a transaction when he lacked any understanding of what was going on. Petitioner, for example, was unaware of the use by First Western of cancellations. He, however, had no difficulty in claiming losses based on cancellations of the forward contracts. We find it equally inconceivable that, if he had even a *256 fleeting profit motive, he would not have paid some attention to his First Western account. Yet, after the initial loss was established, he completely ignored the account. Finally, petitioner does not explain how he expected to make an economic profit by requesting a loss in one year and a gain in the same amount in another year. The only rational explanation for any of this is that petitioner entered into these transactions with the primary, if not sole, objective of obtaining the tax loss. Petitioner, relying again on Heasley, suggests that he did all that was necessary because he was an "unsophisticated" investor. It is true that the Court of Appeals for the Fifth Circuit in Heasley found that "moderate-income" and "unsophisticated" investors were not negligent when they failed to independently investigate an investment in a tax shelter. Heasley v. Commissioner, 902 F.2d at 383-384. That, however, is not the case before us here. In this regard, we are continually surprised to discover, after Heasley, how the definition of an "unsophisticated" and "moderate-income" investor has been expanded to include well-educated persons who have *257 established or been engaged in lucrative businesses. Indeed, if petitioner fits within that description, it would appear that at least some of the taxpayers in Freytag were similarly situated. But in Freytag the additions to tax for negligence were affirmed by the same court that had decided Heasley just a month before. Heasley does not shield petitioner from an addition to tax for negligence. Petitioner has not shown that he used due care, and respondent's determination with respect to the addition to tax under section 6653(a) is sustained. Decision will be entered for respondent. Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩