T.C. Memo. 1998-427


UNITED STATES TAX COURT


RONALD P. BARRANTI AND STEPHANYA M. BARRANTI, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 789-97.                    Filed December 3, 1998.


Woodford G. Rowland, for petitioners.

Daniel J. Parent, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


PARR, Judge: Respondent determined a deficiency in, and an accuracy-related penalty on, petitioners' Federal income tax as follows:

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|----------------------------------------|
| 1993 | $66,493 | $13,299 |

All section references are to the Internal Revenue Code in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. All dollar amounts are rounded to the nearest dollar, unless otherwise indicated. References to petitioner are to Stephanya M. Barranti.

After concessions,[1] the issues for decision are: (1) Whether petitioners are entitled to deduct the $5,852 loss sustained in renting the property to petitioner's brother and the loss realized on the sale of petitioner's residential property. We hold they are not. (2) Whether petitioners are liable for an accuracy-related penalty pursuant to section 6662(a). We hold they are.

Some of the facts have been stipulated and are so found. The stipulated facts and the accompanying exhibits are incorporated herein by this reference. At the time the petition in this case was filed, petitioners resided in Alamo, California.

FINDINGS OF FACT

On February 21, 1991, petitioner acquired by gift a joint tenancy in her grandmother's house located in San Mateo,

---

[1]Before trial, respondent conceded that petitioners are entitled to deduct depreciation expense of $19,936, and $44,369 of the $65,187 expenses reported on Schedule C that were disallowed in the notice of deficiency.

Petitioners conceded that they are not entitled to deduct $20,818 of the expenses they claimed on Schedule C and that they understated dividend income by $1,724 on their return for 1993.

California.  Less than 3 weeks later, the grandmother died, and petitioner became the sole owner of the property.

At the time of the grandmother's death, the property was in a state of disrepair.  For instance, mildew had grown on the interior walls around the windows; the awning over the patio had fallen down; the garage door did not open; the yard required landscaping; and the fence surrounding the property required mending.  Furthermore, the house was located in a neighborhood that was not safe at night.

After several months spent considering whether to sell or to rent the property, petitioner decided that she would repair the house and offer it for rent.  However, petitioner did not know the amount of the rent to charge for the property.

As a starting point in determining how much rent to charge, petitioner sought to determine the fair market value of her property.  To determine the property's value, petitioner had several real estate agents come to the property and provide her with estimates.  A Century 21 real estate agent performed a thorough market analysis of the property on June 6, 1991.  The agent estimated the fair market value of the property was between $219,500 and $275,000, and that it would sell quickly at $229,000.  To determine how much to charge for rent, petitioner researched a trade magazine and several newspapers which listed

comparable properties for rent, and determined that the fair market rental amount was between $700 and $750 per month.

To prepare the property for habitation, petitioner first cleared the house of the decedent's personal property and then began making repairs. Although petitioner was not an experienced home repair person, she wanted to do as much of the repair work herself as possible to minimize its expense. Accordingly, petitioner called various contractors to come to the property to explain what needed to be done and to submit a bid for the work. After receiving the advice, petitioner thanked the contractors for their time, purchased the required materials, and did the work herself. For instance, petitioner scraped the mildew from the interior walls, recaulked the windows and sealed the ground under the house to prevent moisture from entering and reviving the fungus, and sanded and refinished the hardwood floors.

Because petitioner worked on the property only during weekends, the repairs took several months. During this time, petitioner's awareness of the character of the neighborhood and the risks of renting to someone who might prove to be an irresponsible tenant increased. In December 1991, petitioner began negotiating with her brother, Ronny Murray (Murray), to rent the house to him in exchange for $500 per month plus utilities, and his agreement to help petitioner finish the repair work and maintain the property.

Murray helped petitioner repaint the interior of the house and agreed to repair the bathroom plumbing, repair the patio awning to the extent possible and remove the irreparable part, repaint an outside storage shed, replant a flower border, restore a rock garden, and mend the fence. Murray performed the repair work; in May 1992, he moved into the house with his girlfriend and their child.

In December 1992, Murray's girlfriend and child decided to move to Stockton, California, and Murray informed petitioner that he intended to follow them. At that time, petitioner decided to sell her property, rather than offer it for rent to some unknown persons.

In January 1993, petitioner agreed with a real estate sales agent to list the property for sale at approximately $230,000; however, the house did not sell at that price and the relationship between petitioner and the agent deteriorated. On March 9, 1993, petitioner relisted the property with Cornish & Carey, a real estate broker, at a sales price of $219,000. In listing the property with Cornish & Carey, petitioner signed a contract authorizing it to be the exclusive broker for her property. The property was sold in July 1993 for $180,000.

On their 1992 Federal income tax return, petitioners reported total income of $219,388 without reporting any income or expenses from the rental activity. On their 1993 return,

petitioners reported total income of $284,470, before deducting a loss of $5,852 from the rental of petitioner's property and an ordinary loss of $73,501 on its sale.

OPINION

Respondent disallowed the rental loss, because petitioners did not provide any evidence that the property actually was rented during the year at issue or substantiate the expenses. Respondent determined that petitioners are not entitled to claim a loss on the sale of petitioner's property, because they have not proved that it was used in a trade or business or held for the production of income. Petitioners assert that petitioner's property was used as rental property, that petitioner was actively engaged from May 1992 through June 1993 in the trade or business of renting the property, and that they suffered a loss on its rental during 1993. Respondent's determinations are presumed correct, and petitioners bear the burden of proving that respondent's determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Issue 1. Whether Petitioners May Deduct the Losses

Rental Loss

Whether petitioners are entitled to deduct the $5,280 rental loss turns on whether petitioner's property was used by petitioner as a residence.

Congress enacted section 280A as part of the Tax Reform Act of 1976, Pub. L. 94-455, sec. 601, 90 Stat. 1520, 1569, as its response to the concern that rental of property used as a residence by the taxpayer's family "afforded the taxpayer unwarranted opportunities to obtain deductions for expenses of a personal nature." Bolton v. Commissioner, 77 T.C. 104, 108 (1981), affd. 694 F.2d 556 (9th Cir. 1982). Under section 280A no deduction can be taken by a taxpayer with respect to a dwelling unit used as a residence by a taxpayer during the taxable year except for deductions, such as interest and taxes, which are allowable without regard to their connection to an income producing activity or a trade or business. Sec. 280A(a) and (b). A taxpayer is considered to have used a dwelling unit as a residence during the taxable year if the unit is used for personal purposes for the greater of 14 days or 10 percent of the number of days for which the unit is rented at a fair rental. Sec. 280A(d)(1). If a dwelling unit is rented to a member of the taxpayer's family, as defined in section 267(c)(4), for any part of a day, the unit is deemed to have been used on that day by the taxpayer for personal purposes unless the unit is used as the principal residence of the family member and the rent charged to the family member reflects a fair rental for the unit. Sec. 280A(d)(2)(A), (3)(A); Kotowicz v. Commissioner, T.C. Memo. 1991-563; Gilchrist v. Commissioner, T.C. Memo. 1983-288.

Murray used petitioner's property as his principal residence.  Accordingly, in deciding this issue we first consider whether the rent charged Murray reflects a fair rental for the property.

1992 Activity

Petitioner testified that she had a written agreement defining the rental terms with Murray, and that his girlfriend and child lived in the house until January 1993.  Petitioners did not, however, produce the rental agreement at trial.  Furthermore, petitioners did not report any income or expenses with respect to this activity on their 1992 return, or provide any business records or other evidence to substantiate receipt of the rental amounts.  Finally, petitioners did not call Murray or his girlfriend to verify that they rented the house according to the terms petitioner alleges.

Petitioner husband testified that petitioner spent considerable time preparing the house for her brother to rent, that he overheard the amount of rent that petitioner and Murray agreed upon, and that it was his understanding that petitioner did receive the rent on a regular basis.  Conversely, petitioner husband testified that he was not involved in anything to do with the property, that he was uncertain of when Murray moved in or out, and that he visited the house once while Murray was there but he was uncertain when that was.

On the evidence presented, we cannot find that petitioner received $500 in cash, plus the cost of utilities, for rent during the relevant months of 1992.  Petitioner has failed to prove that Murray paid her any rent in the form of cash.  However, petitioner testified that she and Murray agreed that in addition to paying cash rent, Murray would pay rent by making certain repairs and by maintaining the property during his occupancy.  It is well settled rent paid in the form of services rather than cash does not prevent the arrangement from constituting a rental of the property.  McBride v. Commissioner, 50 T.C. 1, 8 (1968); see also sec. 1.61-2(d)(1), Income Tax Regs.  Thus, we consider whether the value of Murray's services was equal to a fair rental for the property.

The exclusive broker agreement that petitioner signed with Cornish & Carey describes the property as "well maintained" with a yard that is "manicured".  Furthermore, Charlene Chanteloup, the listing sales agent for Cornish & Carey, testified that "the garden was lovely", "well maintained", and in "very, very nice condition", and that the property, including the interior of the house, was in very good condition.  On the evidence presented, we are satisfied that the repair and maintenance work was actually performed.

At trial, petitioners presented expert witness testimony as to the fair market rental value of the property.  Expert witness

testimony is appropriate to help the Court understand an area requiring specialized training, knowledge, or judgment.  Fed. R. Evid. 702; Snyder v. Commissioner, 93 T.C. 529, 534 (1989).  The Court, however, is not bound by an expert's opinion.  We weigh an expert's testimony in light of his or her qualifications and with respect to all credible evidence in the record.  Depending on what we believe is appropriate under the facts and circumstances of the case, we may either reject an expert's opinion in its entirety, accept it in its entirety, or accept selective portions of it.  Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Seagate Tech., Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149, 186 (1994).

Petitioners' expert, Lori L. Horn (Horn), is a certified residential real estate appraiser in the State of California, and has been an appraiser for 15 years.  Horn testified at trial and submitted a written report in which she concluded that the fair market rental value of petitioner's property during the year at issue was $850 per month.  In concluding that $500 per month was the appropriate cash rent amount, Horn took the sum of the values of Murray's repairs and maintenance work divided by 14 months (May 1992 through June 1993), and subtracted that amount from $850.

We do not find Horn's opinion persuasive.  For the evidence of comparable rents to be accorded any weight, it must be shown

that the properties are actually comparable.  In her report, dated January 1998, Horn states that she could find no comparable properties listed for rent at the time she did her analysis. Furthermore, her search of newspaper archives produced only one comparable property located in the same neighborhood as petitioner's property; this property was offered for rent in December 1991 at $925 per month.

Finally, Horn's appraisal of the work performed by Murray was a recitation of representations made to her by petitioner. Thus, Horn made no independent appraisal of the value of Murray's work.  Expert testimony is not useful when the expert is merely an advocate for the position argued by one of the parties. Laureys v. Commissioner, 92 T.C. 101, 129 (1989).

Where necessary, we may reach a determination of value based upon our own examination of the evidence in the record.  Lukens v. Commissioner, 945 F.2d 92, 96 (5th Cir. 1991) (citing Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285), affg. Ames v. Commissioner, T.C. Memo. 1990-87.  Moreover, because valuation is necessarily an approximation, it is not required that the value we determine be one as to which there is specific testimony, provided it is within the range of figures that properly may be deduced from the evidence.  Silverman v. Commissioner, supra; Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part

and remanding in part T.C. Memo. 1956-178.  With these principles in mind, we find that petitioner's estimates of the value of the work performed by Murray are reasonable, except for two amounts.

Petitioner estimated that the cost of repairing and painting the fence was $1,000.  We find this amount excessive. Petitioners submitted a written market analysis (the report) of the fair market value of her property which was prepared by a Century 21 real estate agent (the agent).  Petitioner testified that the agent who performed this analysis came to the property and inspected both the exterior and the interior of the house. Furthermore, petitioner testified that she agreed with the evaluation of her property as presented in the report.  The report has a section titled "Condition Report" which provides a check list of exterior items that have been inspected, and a space for the agent to comment on any repairs that may be needed. The agent indicated that he had inspected the fence (among other items), and in the comment space he wrote, "TWO BROKEN BOARDS IN REAR YARD".  We find that this evidence does not support petitioner's estimation of the value of repairing and repainting the fence.  Accordingly, we allow $300 for this repair.

Petitioner estimated that the cost to paint the interior of the house was $1,000.  We accept this estimate; however, petitioner testified that Murray helped her do the painting. Therefore, we accept only $500 as the value of Murray's services.

We find the total value of Murray's repair and maintenance work performed from May to December 1992 to be $2,540,[2] or $318 per month.  This amount is substantially less than the $700 to $750 that petitioner determined as the fair market rental value of her property.

1993 Activity

Petitioners reported $3,000 on Schedule E as the amount of cash rent they received during 1993.  Petitioner testified that Murray lived in the house from January through June 1993.[3]  Thus, petitioners received at most $555 of rent in cash and services ($500 cash plus $55 in value for Murray's gardening service) each month, which is substantially less than the fair market rent determined by petitioner.

---

[2]This amount is the sum of the estimated values of the following repairs:

| | |
|---|---|
| Repair fence | $300 |
| Repair storage shed | 300 |
| Repair plumbing | 300 |
| Repair awning | 500 |
| Paint interior | 500 |
| Gardening service ($55/month for 8 months) | 440 |
| Replace plants | 200 |
| Total | $2,540 |

[3]At trial, respondent introduced evidence that cast doubt on whether Murray occupied petitioner's property during 1993.  This evidence is a page of the contract with Cornish & Carey, signed and dated by petitioner, which describes the property as vacant with access by keybox.  We are satisfied, however, that Murray did occupy the property during the relevant time period, and that his agreement with petitioner was that he would move out as soon as the property was sold.

Petitioners deducted $5,852 on Schedule E as a loss sustained in renting petitioner's property during 1993.[4] In addition to a depreciation expense of $2,895, petitioners deducted $415 for repairs, $80 for cleaning and maintenance, $2,900 for the cost of recovering the floors in carpet and vinyl, $415 for the replacement of the garage door, and $521 for insurance expense.[5] Respondent disallowed these expenses because petitioners did not provide any evidence that the property actually was rented, or substantiate the expenses.

We have found that petitioner rented the property to Murray for a below-market rental amount. Murray is petitioner's brother. A brother is a family member as defined in section 267(c)(4). Accordingly, the property constitutes a dwelling unit used as a residence by petitioner under section 280A, and petitioner is not entitled to deduct the rental expenses other

---

[4]Petitioners stipulated that they actually paid $300 in property taxes, rather than the $1,639 they claimed on their return. At trial petitioner conceded that a reported utilities expense of $402 was claimed in error.

[5]Petitioners submitted copies of some documents to verify these expenses. The carpet and vinyl vendor's invoice is dated Apr. 27, 1992, and shows the cost was actually $2,850. The copy of the insurance company's statement shows that the coverage was from Nov. 28, 1992 to Nov. 28, 1993, and that $176.84 was paid on Nov. 9, 1992. Thus, these expenses were incurred and paid in a year other than the one at issue.
The invoice for the garage door is dated after petitioner quit her rental activity. This expense was incurred to fix up the property for sale and is an adjustment to the amount realized.

than those specified in section 280A(b).  No other rental expenses are allowable under section 280A, because during 1993 the property was never rented at a fair rental.  See sec. 280A(e); <u>McDonald v. Commissioner</u>, T.C. Memo. 1991-242; <u>Bindseil v. Commissioner</u>, T.C. Memo. 1983-411; <u>Gilchrist v. Commissioner</u>, T.C. Memo. 1983-288; <u>Saunders v. Commissioner</u>, T.C. Memo. 1982-322.

## Loss on Sale

Section 165 allows individual taxpayers to take a deduction for losses incurred in a "trade or business" and "any transaction entered into for profit".  Sec. 165(c)(1) and (2).  Accordingly, once it has been established that a taxpayer held property in a trade or business or for the production of income and that his or her motives were profit driven, that individual may, subject to certain limitations,[6] deduct any subsequent loss incurred on the disposition of the property.

### Trade or Business

Petitioners assert that petitioner was engaged in the trade or business of renting her property.  The Supreme Court has stated that to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity,

---

[6]For example, if an individual taxpayer sustains a loss on the sale of a capital asset, the taxpayer's deduction for that loss would ordinarily be subject to the limitations applicable to capital losses, notwithstanding that the property was held for the production of income.  See sec. 1211.

and that the taxpayer's primary purpose for engaging in the activity must be for income or profit.  <u>Commissioner v. Groetzinger</u>, 480 U.S. 23, 35 (1987).

We have found that petitioner charged Murray less than the fair market value to rent her property.  Benefiting a related party with a below-market rental agreement is evidence of the absence of a profit objective.  <u>LaMusga v. Commissioner</u>, T.C. Memo. 1982-742; <u>Sheridan v. Commissioner</u>, T.C. Memo. 1958-215; see also <u>Jasionowski v. Commissioner</u>, 66 T.C. 312 (1976) (lease agreement with friend that provided for rent in the amount of the total cost of the property's insurance and taxes held to lack profit motive).  Accordingly, we find that petitioner was not engaged in the trade or business of renting her property during the year at issue.  Consequently, the loss incurred from the sale of the property is not deductible under section 165(c)(1).

<u>Held for the Production of Income</u>

We now consider whether petitioner held the property for the production of income so as to permit the loss from its sale to be deducted under section 165(c)(2).

Petitioner testified that when she acquired the property she did not intend to hold it for sale, but for rent.  Petitioner husband testified that petitioner spent considerable time preparing the house for her brother to rent, to whom, predominately for personal reasons, petitioner let the property

for a below-market rental amount.  This fact is an indication that petitioner held the property for personal use, not for the production of income.  Bolaris v. Commissioner, 776 F.2d 1428 (9th Cir. 1985) (a rental for less than fair market value will most likely not qualify as property being held for the production of income), affg. in part and revg. in part 81 T.C. 840 (1983); Walet v. Commissioner, 31 T.C. 461 (1958) (property held for personal use of taxpayer's former wife and child not held for production of income), affd. per curiam 272 F.2d 694 (5th Cir. 1959); Hirschel v. Commissioner, T.C. Memo. 1981-189, affd. without published opinion 685 F.2d 424 (2d Cir. 1982). Furthermore, immediately after her brother informed her of his intention to move, petitioner listed the property for sale, rather than offering it for rent at its fair market value. Placing the property on the market for immediate sale, at or immediately after its abandonment for personal use, is ordinarily strong evidence that a taxpayer is not holding the property for postconversion appreciation in value.  Newcombe v. Commissioner, 54 T.C. 1298, 1302 (1970).

Petitioner, who has the burden of proof, has not established that she held the property for profit or the production of income.  It clearly appears on this record that petitioner held the property primarily for personal use, not for profit from rentals nor for appreciation in value.  Considering

all the facts and circumstances of this case, we hold petitioner's loss from the sale of her property is a nondeductible personal expense.

## Issue 2. Accuracy-Related Penalty

Respondent determined that petitioners are liable for an accuracy-related penalty pursuant to section 6662(a) for negligence or disregard of rules or regulations. Petitioners assert that they are not liable for any section 6662(a) penalty, because they relied upon the advice of their certified public accountant in reporting their income. The burden is on the taxpayer to prove the Commissioner's imposition of the penalty is in error. Luman v. Commissioner, 79 T.C. 846, 860-861 (1982); Bixby v. Commissioner, 58 T.C. 757 (1972).

Petitioners claimed deductions to which they were not entitled, underreported dividend income, overstated their Schedule C expenses, and claimed an ordinary loss on the sale of personal use property.

Section 6662 provides for the imposition of a penalty equal to 20 percent of the portion of an underpayment which is attributable to negligence or disregard of the rules or regulations. Sec. 6662(a) and (b)(1). For purposes of this section, the term "negligence" includes any failure to make a reasonable attempt to comply with the Internal Revenue laws, a failure to exercise ordinary and reasonable care in the

preparation of a tax return, and a failure to keep adequate books and records or to substantiate items properly.  Sec. 1.6662-3(b)(1), Income Tax Regs.  The term "disregard" includes any careless, reckless, or intentional disregard of the rules or regulations.  Sec. 6662(c).

Section 6664(c)(1) provides that the penalty under section 6662(a) shall not apply to any portion of an underpayment if it is shown that there was reasonable cause for the taxpayer's position with respect to that portion and that the taxpayer acted in good faith with respect to that portion.  Sec. 6664(c)(1).

The determination of whether a taxpayer acted with reasonable cause and good faith within the meaning of section 6664(c)(1) is made on a case-by-case basis, taking into account all the pertinent facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.  The most important factor is the extent of the taxpayer's efforts to assess the taxpayer's proper tax liability. Id.  Reliance on the advice of a professional (such as an attorney or an accountant) does not necessarily demonstrate reasonable cause and good faith.  Reliance on professional advice, however, constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith.  Id.

Petitioners did not call their accountant as a witness to testify about the information petitioners provided him for

calculating their Federal income tax liability. We cannot assume the testimony of absent witnesses would have been favorable to petitioners. Rather, the normal inference is that it would have been unfavorable. Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Petitioner husband testified that he had a recordkeeping system for his business expenses. Petitioner husband's system was to pay a bill, assign it to a category, and log it into a spreadsheet. At the end of the year, petitioner husband would summarize the items by category, and then give the summary to his accountant, who would calculate the tax due. Petitioner husband's system duplicated expenses which resulted in double deductions. Thus, petitioner husband, not the accountant, was responsible for determining the amounts of the schedule C expenses and whether an expenditure was deductible.

Petitioners have not met their burden of proving that they provided the accountant the full details of petitioner's use of her property. Thus, petitioners may not claim that they reasonably and in good faith relied upon his advice in determining their tax liability with respect to petitioner's property. See sec. 1.6664-4(b)(2), Example (1), Income Tax Regs.

Furthermore, in this case, each petitioner has placed the responsibility for the omissions from income and the claimed excess deductions on the shoulders of the other. Petitioner husband testified that petitioner, not he, was responsible for reporting the income and expenses with regard to her property. For her part, petitioner did not examine the returns for accuracy. She testified that petitioner husband was responsible for the returns, and "he would bring them home and say 'sign on the X' and I'd sign on the X and that would be the end of that." Therefore, neither petitioner made much effort to assess the proper tax liability.

Accordingly, on the basis of all the facts and circumstances of this case, we find that petitioners are liable for the section 6662(a) penalty for negligence or disregard of rules or regulations.

To reflect the concessions of the parties and the foregoing,

Decision will be entered

under Rule 155.