JOSEPH P. CHAMBERLAIN AND D. KATHLEEN CHAMBERLAIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Chamberlain v. Commissioner
Docket No. 27043-85
United States Tax Court
T.C. Memo 1994-228; 1994 Tax Ct. Memo LEXIS 229; 67 T.C.M. (CCH) 2992; May 23, 1994, Filed *229 For petitioners: Stephen L. Williamson and Brian Leftwich. For respondent: Paul J. Krug. FAY, POWELL FAY
MEMORANDUM OPINION FAY, Judge: This case was assigned to Special Trial Judge Carleton D. Powell pursuant to section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE POWELL, Special Trial Judge: By notice of deficiency dated April 16, 1985, respondent determined a deficiency in petitioners' Federal income tax and an addition to tax as follows: Addition to Tax Year
Deficiency
Sec. 6653(a)(1)
1981
$ 36,211.82
$ 1,810.59
Respondent also determined an addition to tax under section 6653(a)(2) in the amount of 50 percent of the interest due on the underpayment, and that the *230 deficiency for 1981 was a substantial underpayment due to tax-motivated transactions and that the increased rate of interest under section 6621(c) was applicable. At the time the petition was timely filed petitioner Joseph P. Chamberlain resided in Lake Charles, Louisiana, and petitioner D. Kathleen Chamberlain resided in Orange, California. The issues are: (1) Whether the increased interest provisions of section 6621(c) apply, and (2) whether petitioners are liable for the additions to tax under section 6653(a)(1) and (2). The facts may be summarized as follows. The deficiency in this case results from the disallowance of a partnership loss in the amount of $ 108,017.86. The partnership is named Great Plains Partners (Great Plains). The partnership loss arises from alleged straddle transactions of forward contracts for government-backed financial securities with First Western Government Securities, Inc. (First Western). The First Western losses were the subject of this Court's opinion in Freytag v. Commissioner, 89 T.C. 849 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on other grounds 501 U.S. 868 (1991). *231 After a lengthy trial, this Court found, based on that record, inter alia, that "The transactions between First Western and its customers were illusory and fictitious and not bona fide transactions." Id. at 875. This Court alternatively held that, even if the transactions had substance, they "were entered into primarily, if not solely, for tax-avoidance purposes." Id. at 876. Based on the finding that the transactions were not bona fide, this Court concluded that additional interest under section 6621(c) was due on the underpayments. Id. at 886-887. In concluding that the transactions were not bona fide, this Court examined various aspects of the First Western program, including the risk of profit and loss, the hedging operation, the margins required and fees charged, the pricing of the forward contracts that were involved, and the manner in which the transactions were closed. In all of these areas we found that the First Western operations were deficient and not conducted as they should have been if bona fide financial transactions were being conducted. With respect to the losses, *232 this Court noted: Petitioners' portfolios were constructed so as to achieve their desired tax losses. In this regard, the most important required data supplied by petitioners were their requested tax losses. Indeed, the program could not be implemented without the tax information. Thus, in analyzing the program from a profit standpoint, from the first, the tax tail wagged an economic dog. * * * [Id. at 878.]
We also pointed out that there were other "gremlins" in First Western's world that dispelled the notion that these transactions were bottomed in financial reality -- reversing transactions months later, confirmations being months late, transactions being made with no documentation, etc. Id. at 882. In the case currently before the Court, petitioner [2] concedes that the transactions with First Western were conducted in the same way as the transactions discussed in Freytag; i.e., the same pricing algorithms were used, the transactions were closed in the same way, etc. He does not contest the disallowance of the losses claimed. He does, however, contest the increased interest under section 6621(c) and *233 the additions to tax for negligence under section 6653(a). Petitioner has a degree in mechanical engineering and has spent most of his working life in the petroleum refinery business. Petitioner has purchased and sold interests in various refineries over the years. In 1981, he was employed by Lake Charles Refining Co. and C&H Refinery in both of which he owned an interest. Petitioner's compensation from the refineries in 1981 was approximately $ 100,500. The other principals of Lake Charles Refining Co. were Billy K. Hargus (Hargus) and Angus Bailey. Through Hargus petitioner was introduced to William E. Bailey (Bill Bailey), an accountant with Bailey Vaught Robertson & Co., an accounting firm in Dallas, Texas. [3]
*234 Great Plains had been created in 1980 to trade in forward contracts of First Western. The original partners in Great Plains were Wordsworth Group, Inc. (Wordsworth) and Marlowe Group, Inc. (Marlowe). Marlowe and Wordsworth were corporations that were wholly-owned subsidiaries of A. F. Campbell & Co., Inc. (A. F. Campbell). A. F. Campbell was wholly owned by Allen F. Campbell. Marlowe and Wordsworth had originally contributed $ 1,000 to the capital of Great Plains, and Wordsworth was the managing partner. Allen F. Campbell was the president and chief executive officer of Wordsworth. The firm of Bailey Vaught Robertson & Co. was the accountant for Great Plains, Marlowe, and Wordsworth. On September 4, 1981, Wordsworth, on behalf of Great Plains, offered partnership interests. The minimum participation unit was $ 154,000 of which $ 14,000 was paid in cash and the balance of $ 140,000 paid by an alleged demand promissory note. The solicitation provided that the fees that First Western would charge would be 54 percent of all margin deposits and that 20 percent of those fees would be related to A. F. Campbell. In addition, management fees were paid to Wordsworth. All total, *235 approximately $ 283,000 was paid by Great Plains to entities controlled by Allen F. Campbell. The solicitation contained a letter from the law offices of Durant, Mankoff, Davis, Wolens & Francis giving their opinion of the partnership agreement that stated that it was "more likely than not" that the gains and losses would be allocated to the newly admitted partners. The letter, which petitioner read, continued: * * * We therefore express no opinion as to whether the partnership will be treated as a partnership for Federal income tax purposes, whether the losses will be deductible for federal income tax purposes by any particular member of the Partnership * * *. * * * * * * the Internal Revenue Service may take a strong stance contrary to the opinions expressed herein, due to the tax deferral and conversion possibilities involved in the transactions * * *. No assurance can be given that the Internal Revenue Service may not disallow or recharacterize any losses realized on the disposition of the Contracts on the basis of these new provisions, or that the Internal Revenue Service will not prevail on such a position if the issue is litigated.
The application to purchase *236 an interest in Great Plains stated, inter alia: D. The undersigned is sufficiently experienced in investments of the type contemplated by the Partnership and has sufficient business and investment acumen to analyze and evaluate the merits and risks of becoming a general partner in the Partnership. E. The undersigned has received, read and fully understands the Great Plains Partners Disclosure Statement and all exhibits and attachments thereto. F. The undersigned understands that becoming a Partner in the Partnership involves special and substantial risks and that the advisability of becoming a Partner in the Partnership is dependent upon the personal financial, economic and tax circumstances of the undersigned. The undersigned has, therefore, consulted with and been advised by W. E. Bailey concerning the risks involved in the operation of the business of the Partnership and the suitability of the undersigned as a Partner in the Partnership. Neither Wordsworth nor its representatives nor any other person other than the undersigned's personal advisor(s) has made any representations to or advised the undersigned concerning the suitability of the undersigned as a Partner *237 of the Partnership G. The undersigned and his personal advisor(s) identified above have had access to and the opportunity to obtain all information regarding the Partnership, Wordsworth and First Western Government Securities, Inc. which they might desire in order to fully analyze and evaluate the merits and risks of becoming a Partner in the Partnership or to verify the information contained in the Disclosure Statement, have received fully all such information which they have requested, and have considered all information which they deem material to a decision as to the advisability of the undersigned becoming a Partner in the Partnership.
On October 21, 1981, petitioner executed a promissory note for $ 140,000, a check for $ 14,000, and the application for partnership interest. These were sent to Allen F. Campbell. There were approximately 55 partners in Great Plains. The cash contributed ranged from a low of $ 14,000 to a high of $ 93,000. The alleged notes ranged from $ 140,000 to $ 930,000. No demand on the notes was ever made. There is no record of any meeting of the partners during its formation or at any time during 1981. Petitioner was introduced into Great Plains' *238 version of First Western's world by Hargus. Hargus also invested in Great Plains. Petitioner did not know Hargus "real well", and did not know whether Hargus had any qualifications to evaluate the investment in Great Plains. Petitioner did not understand straddle transactions. Rather, petitioner apparently relied on Angus Bailey, who also invested in Great Plains. Angus Bailey is a certified public accountant whose business background was in the management of petroleum related industries. He was told about Great Plains by Bill Bailey, and they discussed the tax advantages of the investment. He, however, never understood how the First Western transactions worked and never made any independent investigation of the program. Bill Bailey is a practicing certified public accountant and also has a law degree. He has no specialized knowledge in securities transactions, and he made no independent investigation of the First Western program. Rather, he relied on Ronald Mankoff, the attorney who wrote the letter referred to above, and other parties. While petitioner testified that the tax aspects of the program were not explained to him, Bill Bailey did explain those aspects to petitioner. *239 During 1982, on the advice of Bill Bailey, petitioner invested in another tax shelter program promoted by Allen F. Campbell. Allen F. Campbell was subsequently enjoined from promoting abusive tax shelters because of his promotion of the 1982 shelter. See United States v. Campbell, 704 F. Supp. 715 (N.D. Tex. 1988), affd. 897 F.2d 1317 (5th Cir. 1990). The records of First Western show that Great Plains requested an ordinary loss for the taxable year 1981 in the amount of $ 8,900,000, and a long-term capital gain in the same amount for the taxable year 1983. Great Plains deducted a loss from First Western transactions in the amount of $ 9,079,794.75 on its 1981 partnership information return. Petitioner deducted his aliquot share of that loss in the amount of $ 108,017.86 on his Federal income tax return for 1981, and claimed a refund of an overpayment in the amount of $ 29,329.07. 1. Section 6621(c)
Petitioners contend that the increased interest under section 6621(c) is inapplicable to them, relying on Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408. *240 Section 6621(c)(1) provides that, if there is a "substantial underpayment attributable to tax-motivated transactions," the interest payable under section 6601 "shall be 120 percent of the underpayment rate". A substantial underpayment attributable to a tax-motivated transaction means "any underpayment of taxes * * * attributable to 1 or more tax-motivated transactions if the amount of the underpayment for such year * * * exceeds $ 1,000." Sec. 6621(c)(2). The term "tax motivated transactions" means, inter alia, "any sham or fraudulent transaction." Sec. 6621(c)(3)(v). From a literal reading of the statute, if a transaction is determined to be a "sham", the increased interest applies. In Freytag v. Commissioner, 89 T.C. 849, 887 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on other grounds 501 U.S. 868 (1991), we sustained respondent's determinations that section 6621(c) applied to the First Western underpayments based on our finding that the transactions were "shams." Since petitioners concede that their transactions with First Western were identical to those in Freytag, additional *241 interest under section 6621(c) is applicable here. See Howard v. Commissioner, 931 F.2d 578, 582 (9th Cir. 1991), affg. T.C. Memo. 1988-531. Heasley v. Commissioner, supra, is inapposite. In Heasley v. Commissioner, T.C. Memo. 1988-408, this Court found that the transactions entered into were not entered into for profit, and, therefore, under section 301.6621-2T Q&A-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984), the increased interest under section 6621(c) was applicable. The Court of Appeals for the Fifth Circuit concluded, however, that the taxpayers had "the requisite profit motive." Heasley v. Commissioner, 902 F.2d at 386. While it is true that in Freytag v. Commissioner, 89 T.C. at 882-886, we held, in the alternative, that the transactions were not entered into for profit, we sustained the additional interest under section 6621(c) on the ground that the alleged transactions factually were illusory and fictitious, i.e., "shams", a finding affirmed by the Court of *242 Appeals for the Fifth Circuit in Freytag v. Commissioner, 904 F.2d at 1015-1016, and it is upon that ground that we sustain respondent's determination here. Petitioners, however, contend that for a transaction to be considered a sham under section 6621(c)(3)(v) the transaction must be without economic substance and be entered into without a profit objective, citing Heasley v. Commissioner, supra. While, as discussed infra, we reject their contention that there was a profit motive, we do not read the Fifth Circuit Court of Appeals' opinion in Heasley nor its opinion in Lukens v. Commissioner, 945 F.2d 92, 99-100 (5th Cir. 1991), affg. Ames v. Commissioner, T.C. Memo. 1990-87, to stand for this proposition. When a transaction is the simple product of smoke and mirrors, it is a factual sham, regardless whether the taxpayer may have thought that a profit might have been made. See Cherin v. Commissioner, 89 T.C. 986, 993-994 (1987). This is all that section 6621(c)(3)(v) requires. See Statement of the Managers attached to the conference report, *243 H. Conf. Rept. 99-841 II-796 (1986), 1986-3 C.B. (Vol. 4) 796. 2. Negligence Respondent determined that additions to tax under section 6653(a) are due for negligence. Section 6653(a) provides in relevant part that "If any part of any underpayment * * * is due to negligence or intentional disregard of rules and regulations * * * there shall be added to the tax an amount equal to 5 percent of the underpayment." "'Negligence is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Freytag v. Commissioner, 89 T.C. at 887 (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. on this issue 43 T.C. 168 (1964)); see also Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982). Petitioners have the burden of establishing that their actions were not negligent. Freytag v. Commissioner, 904 F.2d at 1017. The negligence question focuses on petitioner Joseph P. *244 Chamberlain. He entered into the transactions with First Western through his interest in Great Plains. Petitioner contends that the additions to tax under section 6653(a) are unwarranted. The gravamens of his contention are that he relied on expert advice and that his motive for entering into the transactions was not to avoid taxes. With regard to petitioner's reliance on experts, such reliance, standing alone, will not insulate a taxpayer from the addition to tax for negligence. It must be shown that the expert had the expertise and knowledge of the pertinent facts to render such an opinion on the subject matter. Freytag v. Commissioner, 89 T.C. at 888. Furthermore, it must be established that the person rendering the advice is independent and does not have an economic interest in giving the advice. Rybak v. Commissioner, 91 T.C. 524, 565 (1988). Petitioner has a background in petroleum engineering. Prior to 1981, he had made no investments in any transactions of this nature. He was told about the First Western program by Hargus, whom he did not know well, and who had no expertise in dealing with straddles in *245 forward contracts that were the heart of the First Western program. He also claims to have relied on Angus Bailey. Like petitioner, however, Angus Bailey never understood how the program worked. Rather, both seemed to have relied on Bill Bailey. But there is nothing in this record to indicate that Bill Bailey was qualified to give advice as to the bona fides of the First Western program. In the final analysis, our words in Rybak v. Commissioner, supra at 565, explain the situation: In these circumstances, petitioners did not rely on competent, independent parties; they did no more than inquire of the promoter if the investment was sound. Such reliance is not the type of activity which will overcome the addition to tax for negligence or intentional disregard of the rules and regulations. [Citations omitted.]
See also Marine v. Commissioner, 92 T.C. 958, 992 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); Patin v. Commissioner, 88 T.C. 1086, 1130 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), *246 affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). It must be noted that these transactions could hardly be described as being run-of-the-mill, and petitioner admits that he did not understand the transactions. They involved alleged forward contracts to purchase and sell millions of dollars of mortgage-backed securities. See Freytag v. Commissioner, 89 T.C. at 862-863. There was no market for these contracts, and First Western was on both sides of the transactions. In discussing the First Western transactions, the Court of Appeals for the Fifth Circuit noted: "no reasonable investor would surrender total control of his or her ability to profit and lose unless satisfied that the risk of loss had been greatly diminished or eliminated." [Freytag v. Commissioner, 904 F.2d at 1016 (quoting Sochin v. Commissioner, 843 F.2d 351, 356 (9th Cir. 1988).] *247 Furthermore, the ratio of the tax losses compared with the payments was huge, between 8:1 and 10:1. This latter fact was particularly important because, as the Court of Appeals for the Ninth Circuit recognized in Zmuda v. Commissioner, 731 F.2d at 1422, during this period there was "extensive continuing press coverage of questionable tax shelter plans." As we noted in our opinion in Freytag v. Commissioner, 89 T.C. at 888, given this scenario, a taxpayer could not merely rely on the documents supplied by First Western, and further investigation was clearly mandated. If there had been any serious examination of the program "No reasonable person would have expected * * * [the] scheme to work." Freytag v. Commissioner, 89 T.C. at 889; cf. Hanson v. Commissioner, 696 F.2d 1232, 1234 (9th Cir. 1983), affg. per curiam T.C. Memo. 1981-675. Finally, we note that petitioner's alleged profit motive for the First Western transactions is simply cut from whole cloth. The raison d'etre of the program was to convert ordinary income into long-term *248 capital gains and defer the payment of taxes. With his background, Bill Bailey must have understood this, and he explained the alleged tax advantages to petitioner. Nonetheless, petitioner steadfastly contends that he knew nothing about the alleged tax advantages or the requests for tax losses that were supplied to First Western. This has a decidedly hollow ring. First, if we were to accept petitioner's argument, we would have to accept that the request for a tax loss, which was well tailored to his situation, materialized out of thin air. We decline that invitation. Second, it is highly unlikely that anyone whose primary purpose was to make a profit would enter into a transaction when he lacked any understanding of what was going on. The only rational explanation for any of this is that petitioner entered into these transactions with the primary, if not sole, objective of obtaining the tax loss. Petitioner, relying again on Heasley, suggests that he did all that was necessary because he was an "unsophisticated" investor. It is true that the Court of Appeals for the Fifth Circuit in Heasley found that "moderate-income" and "unsophisticated" investors were not negligent *249 when they failed to independently investigate an investment in a tax shelter. Heasley v. Commissioner, 902 F.2d at 383-384. That, however, is not the case before us here. In this regard, we are continually surprised to discover, after Heasley, how the definition of an "unsophisticated" and "moderate-income" investor has been expanded to include well educated persons who have established or been engaged in lucrative businesses. Indeed, if petitioner fits within that description, it would appear that at least some of the taxpayers in Freytag were similarly situated. But, in Freytag the additions to tax for negligence were affirmed by the same court that decided Heasley just a month before. Heasley does not shield petitioners from additions to tax for negligence. Petitioners have not shown that they used due care, and respondent's determinations with respect to the additions to tax under section 6653(a)(1) and (2) are sustained. Decision will be entered for respondent. Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The deficiencies and additions to tax focus on the activities of petitioner Joseph P. Chamberlain with First Western, and for convenience he will be referred to as petitioner.↩
3. Angus Bailey and Bill Bailey are not related.↩