Morris A. WEINER, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. CIV.A.H–00–1297.

United States District Court,
S.D. Texas,
Houston Division.

Dec. 30, 2002.

Thomas E. Redding, Redding & Associates, Houston, TX, for Morris A. Weiner, plaintiff.

Michael D. Powell, Dept of Justice Tax Division, David B. Coffin, Dept of Justice Tax Division, Dallas, TX, for United States of America, defendant.

## MEMORANDUM AND ORDER

ATLAS, District Judge.

A bench trial was held before this Court on December 17, 2002, on Plaintiff Morris Weiner's claim for a refund of interest for the tax year 1984 assessed by the IRS pursuant to 226 U.S.C. § 6621(c), the Internal Revenue Code ("IRC") provision authorizing enhanced interest on a substantial underpayment of tax attributable to a tax motivated transaction.[1] After hearing the evidence and argument of counsel, the Court took the matter under advisement. The Court now finds that Weiner had a profit motive in investing in the Travertine Flame Associates ("TFA") partnership in 1984 and therefore concludes that imposition of § 6621(c) interest is not appropriate in this case.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Weiner seeks a refund of § 6621(c) interest he paid to the IRS for the tax year 1984.[2] Weiner invested $40,000 cash in TFA in 1984, and took a $85,683 deduction on his personal income tax return for that year as his share of partnership losses from TFA. In 1991, the IRS issued a Notice of Final Partnership Administrative Adjustment ("FPAA") with respect to TFA for the year 1984 disallowing all of the farming losses and other deductions claimed by TFA. The FPAA included as one of several explanations for the adjustments that the partnership's activities were sham transactions. Defendant's Exhibit ("DX") 7. In 1997, Weiner offered to settle his share of the adjustments and the IRS accepted the offer. Weiner agreed to an additional tax assessment of $15,851

---

1. The Fifth Circuit recently referred to § 6621(c) enhanced interest as a "punitive interest provision." *Copeland v. Commissioner*, 290 F.3d 326, 336 (5th Cir.2002).

2. Based upon the parties' agreement, the Court severed the claims for the 1984 tax year from Weiner's claims related to the 1985 and 1986 tax years. *See* Order to Sever [Doc. # 89].

above the taxes he previously paid for 1984. This Court ruled earlier in this case that Weiner's settlement did not resolve the issue of whether § 6621(c) interest applied. *See* Amended Memorandum Opinion [Doc. # 79], at 55–57. When the IRS made the tax assessment against Weiner pursuant to the settlement, it also assessed § 6621(c) interest, which Weiner paid or bonded.

Weiner asserts that there is no basis for the IRS's assessment § 6621(c) interest against him, and seeks a refund of the 20% interest component assessed over the standard rate imposed by 26 U.S.C. §§ 6601 and 6621(a). In this litigation, the IRS contends more specifically that TFA's farming transactions during 1984 were sham transactions and therefore Weiner's underpayment of taxes is attributable to a "tax-motivated transaction" justifying the enhanced interest.

## II. *THE STATUTE AT ISSUE*

The version of § 6621(c) applicable in this case authorized the IRS to assess interest at 120% of the ordinary interest rate established by §§ 6601 and 6621(a) on any substantial underpayment attributable to a tax motivated transaction.[3] Section 6621(c), as applicable to this case, provides in relevant part:

    (1) In General.—In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the underpayment rate established under this section.

    (2) Substantial Underpayment Attributable to Tax Motivated Transactions.—For purposes of this subsec-

tion, the term 'substantial underpayment attributable to tax motivated transactions' means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000.

  (3) Tax Motivated Transactions. -

    (A) In General.—For purposes of this subsection, the term 'tax motivated transaction' means -

      (i) any valuation overstatement (within the meaning of section 6659(c)),

      (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8),

      (iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092),

      (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, and

      (v) any sham or fraudulent transaction.

    (B) Regulatory Authority.—The Secretary may by regulations specify other types of transactions which will be treated as tax motivated for purposes of this subsection and may by regulations provide that specified transactions being treated as tax motivated will no longer be so treated.

\*    \*    \*    \*    \*    \*

---

**3.** The provision at issue was originally enacted as part of the Tax Reform Act of 1984 as § 6621(d). It was amended by the Tax Reform Act of 1986 and redesignated as § 6621(c). It was repealed in 1989 for returns due after December 31, 1989.

(C) Effective Date of Regulations.—Any regulations prescribed under subparagraph (A)(iv) or (B) shall apply only to interest accruing after a date (specified in such regulations) which is after the date on which such regulations are prescribed.

(4) Jurisdiction of Tax Court.—In the case of any proceeding in the Tax Court for redetermination of a deficiency, the Tax Court shall also have jurisdiction to determine the portion (if any) of such deficiency which is a substantial underpayment attributable to tax motivated transactions.

Tax Reform Act of 1986, Pub.L. No. 99–514, §§ 1511, 1535, 100 Stat. 2085, 2744, 2750 (1986).[4] Thus, if more than $1,000 of Weiner's 1984 underpayment was attributable to a tax motivated transaction, then that attributable underpayment is subject to § 6621(c) enhanced interest. The only type of tax motivated transaction asserted by the IRS as the basis for its assessment of § 6621(c) is "sham transaction" as provided for in § 6621(c)(3)(A)(v).

## III. ANALYSIS

### A. Burden of Proof

As a threshold matter, the Court must determine where the burden of proof in this case lies. As a general rule, an IRS assessment is presumed to be correct and the taxpayer bears the burden of proving both the excessiveness of the assessment and the correct amount of any refund to which he is entitled. *Melton v. Teachers Ins. & Annuity Ass'n of America*, 114 F.3d 557, 560 (5th Cir.1997); *Portillo v. Commissioner*, 932 F.2d 1128, 1133 (5th Cir.1991). This burden applies to the ap-plication of § 6621(c) interest. *See Heasley v. Commissioner*, 902 F.2d 380, 382 (5th Cir.1990) (stating "[w]e presume that the IRS correctly determined the Heasleys' taxes and penalties. The Heasleys bear the burden of proving otherwise." (citations omitted)).

■ The parties agree that there is an exception to this general rule in the case of a "naked assessment ... without any foundation whatsoever." *United States v. Janis*, 428 U.S. 433, 441, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *Portillo*, 932 F.2d at 1133. The IRS's assessment in this case was based on its Settlement Agreement with Weiner that resulted from its issuance of an FPAA disallowing all of TFA's farming expenses and deductions for 1984. Weiner does not contend that the assessment of the tax was a naked assessment. Instead, he contends that the assessment of § 6621(c) interest was naked because the IRS never made a determination regarding Weiner's individual profit motive. Whether individual profit motive is a necessary element of the "sham transaction" determination is discussed in detail below. For purposes of assigning the burden of proof, it is only necessary for the IRS to demonstrate that its assessment has *some* factual predicate for the determination. *See Portillo*, 932 F.2d at 1133.

The presumption of correctness generally prohibits a court from looking behind the Commissioner's determination even though it may be based on hearsay or other evidence inadmissible at trial. Justification for the presumption of correctness lies in the government's strong need to accomplish swift collection of revenues and in the need to encourage

---

**4.** The wording of subsection (c)(1) above reflects a slight modification effected by the 1986 amendment that was applicable only to interest accruing after December 31, 1986. This change is not relevant to the issues be-fore the Court as to the 1984 tax year. The addition of subsection (c)(3)(A)(v) was made applicable to interest accruing after December 31, 1984, and is the crucial section in this case.

taxpayer record keeping. The need for tax collection does not serve to excuse the government, however, from providing some factual foundation for its assessments. The tax collector's presumption of correctness has a herculean muscularity of Goliath like reach, but we strike an Achilles' heel when we find no muscles, no tendons, no ligaments of fact.[5]

*Id.* (citations and internal quotation marks omitted). There thus must be at least some "ligaments of fact" to support an enhanced interest assessment under § 6621(c). *See id.*

It is a matter of record that the IRS began a criminal investigation of AMCOR and its partners in 1988 or 1989 and confiscated AMCOR's partnership records in March 1989. The IRS made a determination that the farming expenses claimed on Schedule F of the TFA return for 1984 were not allowable. This determination was the basis for the IRS's issuance of the FPAA in 1991. The FPAA lists several reasons for the disallowance, including that the partnership's activities were sham transactions. *See* DX 7. The IRS also relies on its determination in the Summary of AMCOR Appeals Settlement Offer ("SAASO") that "interest is to be comput-

ed under Code Section 6621(c)." The IRS claims to have sent the SAASO to all the TFA partners, including Weiner, along with the Form 870-P(AD) for his consideration for settlement. Weiner, however, does not acknowledge receiving the SAASO. The dispute about whether Weiner received the SAASO is immaterial. The question is whether the IRS had a factually-based rationale for its § 6621(c) interest assessment, not whether Weiner understood it or agreed with it.

Moreover, the IRS has presented evidence that it analyzed the accuracy of representations by TFA about its farming transactions. Weiner does not argue that no such analysis was conducted. Weiner acknowledges that he knew when he settled that the IRS intended to assess § 6621(c) interest. *See, e.g.,* DX 9. The FPAA makes it clear that the farming deductions, in the IRS's view, were not proper for numerous reasons, including that they were tax-motivated transactions and were shams. Whether or not the IRS's decision to impose § 6621(c) interest is correct, or was the product of a legally sufficient determination, is not the threshold issue. At this stage, the Court is concerned only with whether the IRS had

**5.** The IRS contends that this exception is limited to cases involving unreported income. *See Portillo,* 932 F.2d at 1133 (stating "[s]everal courts, including this one, have noted that a court need not give effect to the presumption of correctness in a case involving unreported income if the Commissioner cannot present some predicate evidence supporting its determination."). The Fifth Circuit in *Sealy Power, Ltd. v. Commissioner,* 46 F.3d 382, 387 (5th Cir.1995), specifically held that the burden-shifting principle of unreported income cases such as *Portillo* does not extend to cases in which the Commissioner rejects deductions or credits claimed by a taxpayer. *See also Karme v. Commissioner,* 673 F.2d 1062, 1065 (9th Cir.1982) (explaining "[w]hen the Commissioner attempts to include unreported income, the Commissioner should

have the burden of proving his case 'because the taxpayer may face practical difficulties in attempting to refute the Commissioner's assertion that the taxpayer received unreported income.' That problem does not exist when, as in this case, the Commissioner questions a deduction. In this situation the taxpayer retains the burden of proof."). Nonetheless, the Fifth Circuit has not addressed directly whether the "naked assessment" exception applies to the interest assessment under § 6621(c). In any event, the Court holds that Weiner has the burden to prove that the assessment is incorrect even under the burden-shifting scheme of *Janis* and *Portillo* because the IRS has demonstrated through its proffer and documents in evidence that the assessment was not without "ligaments of fact," as discussed in the text.

*any* factual basis for its determination.[6] *See Portillo*, 932 F.2d at 1133.

The circumstances at bar have nothing in common with *Janis*, the Supreme Court case establishing the "naked assessment" exception, or *Portillo*. In *Janis*, the only evidence the IRS had on which to support its assessment consisted of gambling ledgers that were illegally obtained pursuant to a defective search warrant. Absent the illegally seized materials, the IRS had no factual basis for an assessment. Thus, the Supreme Court ruled that the IRS's determination of the tax due was without rational foundation, excessive, and was not properly subject to the usual rule with respect to the burden of proof in tax cases. *Janis*, 428 U.S. at 441, 96 S.Ct. 3021. In *Portillo*, the IRS concluded that the taxpayer had unreported income based on his employer's Form 1099, which reflected income in excess of that reported by the taxpayer on his Form 1040. However, the taxpayer denied the accuracy of the Form 1099, and the employer could provide no evidence to support most of the cash payments it allegedly made to the taxpayer. Thus, the IRS's decision to accept the Form 1099 as true was arbitrary and without the necessary "ligaments of fact." *Portillo*, 932 F.2d at 1134.

■ Further, Weiner does not contend that the determination on which the assessment of the tax deficiency was based was a "naked assessment." Weiner cites *no case in support* his burden shifting proposition that involves the assessment of interest on an uncontested tax deficiency assessment. The Court concludes that the interest assessment was not a "naked assessment" and the burden of proof to establish that the interest assessment was incorrect remains on Weiner, as in the ordinary refund case.

### B. Standards for Sham Transaction under § 6621(c)(3)(A)(v)

The next question confronting the Court is what standard governs a "sham transaction" determination. The phrase "sham transaction" is not defined in § 6621(c) or elsewhere in the Internal Revenue Code. Thus, the Court must look to case law for the proper standard for making a "sham transaction" determination.

The IRS contends that a transaction can be a sham "in fact," *i.e.*, one that never even occurred, citing *Compaq Computer Corp. and Subsidiaries v. Commissioner*, 277 F.3d 778, 781 n. 1 (5th Cir. 2001), or a sham "in substance," *i.e.*, one that lacks economic substance, citing *Killingsworth v. Commissioner*, 864 F.2d 1214, 1216–17 (5th Cir.1989). The IRS, citing *Copeland v. Commissioner*, 290 F.3d 326, 338 (5th Cir.2002), argues that the focus of the Court's sham transaction analysis should be on the partnership's conduct, not the individual partners. However, in acknowledgment of the Court of Appeals' discussion in *Copeland*, the IRS, somewhat inconsistently, asserts that in the partnership context, a sham transaction also exists where the partner invested in the partnership without an individual profit motive. *Id.*

Weiner contends that the Fifth Circuit has consistently required *both* lack of economic substance of the partnership transactions and lack of individual profit motive in finding an assessment of § 6621(c) interest justified. While the Fifth Circuit has not explicitly decided this issue, the Court is persuaded that Weiner's analysis of the available authorities is more sound than the IRS's contrary position.

Case law analyzing sham transactions in the wake of the Supreme Court case of

---

**6.** Unlike a negligence interest penalty, there is no statutory requirement that the IRS set forth in detail the legal grounds for an assessment of § 6621(c) interest in a notice of deficiency or otherwise prior to its assessment.

*Frank Lyon Co. v. United States*, 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978), has left the issue somewhat muddled. In *Frank Lyon*, the Supreme Court held that a transaction cannot be treated as a sham unless it is shaped *solely* by tax-avoidance features. 435 U.S. at 583–84, 98 S.Ct. 1291 (emphasis added). In *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91–92 (4th Cir.1985), the Fourth Circuit interpreted the *Frank Lyon* decision to require a two-prong analysis:

> To treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of profit exists.

The Fifth Circuit in *Compaq* recognized the tension between those circuits that apply the two-prong test of *Rice's Toyota World* and those that collapse the prongs into a "factors" test.[7] The Fifth Circuit found it unnecessary in *Compaq* to rule definitively as to the proper standard because in that case the taxpayer met its burden on both prongs. *See Compaq*, 277 F.3d at 781–82.

■ It is significant that *Compaq* was not a case arising from a taxpayer's invest-ment in a partnership, let alone a limited partnership as presented in this case. Thus, the question of how a partner's individual profit motive fits into the sham inquiry was not at issue in that case. This distinction is important because generally the economic substance and profit motive inquires are inextricably linked because the plaintiff-taxpayer and the entity that engaged in the transaction are one and the same. *See id.* at 785–86. Plaintiff Compaq engaged in a foreign stock transaction involving the purchase and resale of American Depository Receipts ("ADRs"). The Court found that Compaq's ADR transaction had economic substance, and that even assuming Compaq sought primarily to get otherwise unavailable tax benefits from the transaction, tax avoidance was not Compaq's sole motivation. In contrast, in the context of a limited partnership, the entity engaging in the transaction and the taxpayer are entirely different, and the lack of economic substance of the partnership transaction that led to the partner's substantial underpayment of taxes in fact may be completely unknown to the taxpayer-partner.[8] Therefore, it is not surprising that in determining "sham transaction" in a passive investor's action for a refund of § 6621(c) interest, the Fifth Circuit has repeatedly looked to the individual profit motive of the taxpayer.[9]

---

**7.** *See ACM Partnership v. Commissioner*, 157 F.3d 231, 247 (3d Cir.1998) (holding that "these distinct aspects of the economic sham inquiry do not constitute discrete prongs of a rigid two-step analysis, but rather represent related factors both of which inform the analysis of whether the transaction had sufficient substance, apart from its tax consequences, to be respected for tax purposes."); *James v. Commissioner*, 899 F.2d 905, 908–09 (10th Cir.1990).

**8.** In addition, as discussed in more detail below, in a TEFRA case, there are serious jurisdictional hurdles presented by the requirement that a district court determine the economic substance of partnership transac-tions in a partner-level proceeding. Thus, conflation of the two-prongs in analyzing § 6621(c) with respect to a partnership investment is unwieldy, if not impossible.

**9.** In *Thompson v. United States*, 223 F.3d 1206, 1212–13 (10th Cir.2000), and *Thomas v. United States*, 166 F.3d 825, 832–34 (6th Cir. 1999), the Tenth and Sixth Circuits, respectively, refused to conduct inquiries into the partners' motives. However, in each of those cases the partner had conceded that the partnership transactions were "sham transactions." Thus, to the extent profit motive is an element of a sham transaction, any inquiry into motive was moot in those cases, and the courts simply refused to add an additional

In *Heasley v. Commissioner,* 902 F.2d 380 (5th Cir.1990), the taxpayers appealed a Tax Court decision upholding penalties and interest assessed by the IRS, including § 6621(c) interest imposed, in part, on the grounds that the energy conservation program in which they invested at the recommendation of their financial consultant was not engaged in for profit and thus was tax-motivated. The Fifth Circuit held that the Tax Court erred in not considering that the Heasleys' individual intent in investing in the program was to earn income, not to avoid tax liability, and therefore erred in finding that the Heasleys' investment was tax-motivated.

Similarly, in *Lukens v. Commissioner,* 945 F.2d 92 (5th Cir.1991), the Tax Court upheld the imposition of § 6621(c) interest. Lukens invested in a partnership [10] formed to purchase time-share units in vacation homes. In *Lukens,* the Fifth Circuit stated that "[a] sham or fraudulent transaction includes transactions in the partnership context that were not entered into for profit and are without economic substance." [11] 945 F.2d at 99. The Fifth Circuit considered the Tax Court finding that Lukens' personal intent in investing was tax-driven and he was without any profit-motive "independent of tax savings." [12] *Id.* at 100. The Tax Court therefore found that the transaction was a sham, which finding the Fifth Circuit concluded was not clearly erroneous.

The decision in *Chamberlain v. Commissioner,* 66 F.3d 729 (5th Cir.1995), also is instructive. In that case, the taxpayers challenged interest and penalties assessed by the IRS following disallowance of claimed partnership losses. In *Chamberlain,* there was no dispute that the transaction engaged in by the partnership was a sham.[13] The Tax Court sustained the Commissioner's assessment of additional penalty interest on the basis of the sham transaction. In so doing, the Tax Court found that Chamberlain became a partner without the required profit motive. *Id.* at 732. The Tax Court addressed this issue despite its view that the taxpayers' profit motive was irrelevant to the imposition of additional interest under § 6621(c). *Chamberlain,* 66 F.3d at 731. In evaluating the Tax Court's decision, the Fifth Circuit noted that "[i]n determining a profit motive we focus on the intent of the taxpayer, not that of the underlying entity or activity." *Id.* at 732 n. 13. The Fifth Circuit declined to find the Tax Court's decision clearly erroneous, because that decision "[o]bviously ... [was] based in large part on the trier's credibility determination." *Id.*

The taxpayer-plaintiffs in *Durrett v. Commissioner,* 71 F.3d 515, 517 (5th Cir. 1996), were among several thousand inves-

factor beyond "sham" to the test for enhanced interest under § 6621(c)(3)(A)(v). This approach is materially different from the Fifth Circuit's.

10. There is no indication that Lukens invested in a limited partnership.

11. The *Lukens* court cites *Patin v. Commissioner,* 88 T.C. 1086, 1987 WL 49318 (1987), for this proposition. In *Patin,* the Tax Court analyzed the taxpayers' profit motive as part of its holding that the transactions in issue lacked economic substance. 1987 WL 49318, 88 T.C. at 1129.

12. The Tax Court found that "the motivating factor in these cases was the extravagant tax write-off petitioners received as compared to their cash outlay. Without the tax write-offs, petitioners would have received no benefit from the purchase of the timeshares." *Lukens,* 945 F.2d at 100. In contrast, Weiner received a tax write off approximately equal to twice his investment in the first year, not an extravagant write-off in comparison.

13. In *Chamberlain,* the taxpayers stipulated that the transaction at issue was the same as that determined to be a sham in *Freytag v. Commissioner,* 904 F.2d 1011 (5th Cir.1990).

tors in the same tax shelter program that was involved in *Chamberlain* and *Freytag.* The Durretts went to trial in the Tax Court only on the assessment of penalty interest that the IRS based on a substantial tax underpayment attributable allegedly to a tax-motivated transaction. *Id.* Just as in Chamberlain, the Fifth Circuit affirmed the Tax Court's finding that the taxpayer did not have a profit motive despite his contrary testimony. *Id.* at 517. Also as in Chamberlain, the Fifth Circuit affirmed based on the Tax Court's finding as to the taxpayer's individual motivation.

Nowhere in any of these decisions did the Court of Appeals say that the taxpayer's profit motive or lack thereof was not relevant. The IRS nevertheless asserts that *Copeland v. Commissioner,* 290 F.3d 326 (5th Cir.2002), is inconsistent with this analysis. The Court disagrees and instead concludes that *Copeland* is inapposite to the case at bar. In *Copeland,* the Tax Court found that the partnerships at issue were "sham transactions" under 26 U.S.C. § 183 and imposed § 6621(c) interest. The Fifth Circuit reversed and held that the IRS could not impose § 6621(c) interest because the IRS did not disallow the deductions under § 183 (which does not apply to partnerships) and because the IRS had proffered during the administrative process no alternative basis for impos-

ing such interest. The Fifth Circuit's holding did not depend on any ruling about the partnership's economic substance or anyone's profit motive. The Court did not find that the taxpayers' individual profit motive was irrelevant to a sham transaction inquiry, as the IRS contends here. Rather, the Court of Appeals held that the profit motive question was irrelevant to the inquiry presented because the IRS had not based its imposition of enhanced interest on a legal theory applicable to partnerships. *Copeland,* 290 F.3d at 333. In *dicta,* the Court said "[i]t is equally accepted that in the partnership context, the profit motive inquiry focuses on the partnership, not the individual partners." *Id.* at 335. However, the Court made that statement in the context of explaining why deductions of partnership expenses in that case could not be construed as having been disallowed under § 183. The Court was not addressing the standards for assessment of § 6621(c) interest against an individual partner pursuant to the judicially defined "sham transaction" of § 6621(c)(3)(A)(v).[14] Significantly, the Court expressly stated that "[h]ere, we never reach the question of whether profit motive is to be tested at the individual or partnership level." *Id.* at 337. The Court then went on to distinguish *Lukens, Chamberlain,* and *Durrett,* on the grounds that in those case the IRS was seeking to

**14.** *Copeland* cites *Tallal v. Commissioner,* 778 F.2d 275, 276 (5th Cir.1985). *Tallal* was a case about whether to allow a partnership deduction under § 702(b), not a partner-level proceeding about the assessment of § 6621(c) interest. Similarly, in *Holladay v. Commissioner,* 649 F.2d 1176, 1180 (5th Cir.1981), the Fifth Circuit found that "the allocation of all of the venture's losses to Holladay lacked economic substance and was clearly a sham under IRC § 704(a)." Again, the Court was addressing only the decision to disallow the loss deduction, not the application of enhanced interest under the "sham transaction" test of § 6621(c). *Copeland* cautions against importing a test from one statutory provision

into an inquiry under an unrelated provision. For this reason, *Copeland* criticizes *Hill v. Commissioner,* 204 F.3d 1214, 1218 (9th Cir. 2000), which holds that under a § 183 analysis, the determination of an existing profit motive is made at the partnership level and does not address the subjective intent of the particular partner in question. In *Hill,* the Ninth Circuit held that application of § 6621(c) interest against a partner was proper if the partnership lacked a profit motive under § 183. *Id.* at 1219. *Copeland* criticizes *Hill* for not applying the requirement that the deductions be actually *disallowed under* § 183.

impose the increased interest rate by means of § 6621(c)(3)(A)(v), the provision relied upon by the IRS in this case, and noted that in all three of those sham transaction cases, the Court of Appeals' affirmance was based at least in part on the Tax Court's factual finding that the individual taxpayers lacked a profit motive when they engaged in the transaction of investing in the partnerships in issue. *Id.* Thus, *Copeland* is not inconsistent with this Court's decision to rely on the precedent of those Fifth Circuit cases specifically dealing with assessment of increased interest against a partner pursuant to § 6621(c)(3)(A)(v).

The Court concludes that if Weiner proves by a preponderance of the evidence that he had an individual profit motive, or that the TFA partnership transactions had economic substance, then the sham transaction subset of tax-motivated transactions under § 6621(c)(3)(A)(v) is inapplicable and § 6621(c) interest is not warranted.[15]

## C. *Economic Substance of the Partnership Transactions*

For different reasons, neither party wants this Court to make a determination under the *Rice's Toyota* test on the "economic substance," or lack thereof, of the TFA partnership's farming transactions

disallowed by the IRS. The IRS contends that Weiner is bound by the decision of the Tax Court in the TFA proceeding that TFA's farming transactions "lacked economic substance, as described in former I.R.C. § 6621(c)(3)(A)(v)." DX 12, at 2. Weiner contends that the economic substance of the partnership transactions is a "partnership item" beyond this Court's jurisdiction.[16] This case presents a procedural quandary that results from Weiner's decision to settle the tax deficiency issue, but to contest the § 6621(c) interest issue while attempting to participate in the TFA Tax Court proceeding. In that proceeding, the § 6621(c) interest issue was decided adversely as to non-settling partners, *see* DX 12, apparently as part of a global agreement with the TFA Tax Matters Partner[17] who took the lead in the Tax Court litigation.

■■ The Court, with reservation, declines to hold that Weiner is bound by the Tax Court decision on lack of economic substance. While the Court is unpersuaded by Weiner's argument that the Tax Matters Partner had a conflict of interest in entering the settlement, there is an unresolved legal issue about the Tax Court's jurisdiction once a limited partner settles certain issues through an 870–P(AD), as Weiner did.[18]

15. The Court recognizes the dichotomy in the two *Rice Toyota* elements, *i.e.*, that one focuses on the investor's motivation to invest in the business entity in issue, whereas the other element focuses on the economic substance of the entity's transactions, which is in effect the entity's profit motive. *See Lukens*, 945 F.2d at 100. In many cases, this issue is insignificant. However, in the context of limited partnerships, the disparity in the focus of the respective elements is more problematic, as explained elsewhere in this opinion.

16. The statutory framework under the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA") is explained in the Court's Amended Memorandum Opinion, at 7–10.

Under TEFRA, the treatment of all "partnership items" must be determined in a partnership level proceeding. 26 U.S.C. § 6221.

17. TEFRA requires partnerships to designate a Tax Matters Partner to act as a liaison between the IRS and the partnership in any tax-related proceedings. 26 U.S.C. § 6227.

18. *See* Amended Memorandum Opinion, at 32 n. 24. As the Court noted in its Amended Memorandum Opinion, at 33–35, the evidence at trial leads the Court to believe it would not be unfair to hold Weiner to have waived his right to object to the TMP's Tax Court settlement because Weiner elected not to even attempt to participate in the partnership level proceeding. This perception was

■ At trial in this Court, the IRS made a proffer that if permitted by the Court it would prove that the partnership transactions were nothing more than "check swaps," that no seeds were purchased and no crops were grown or sold. However, even if the Court were inclined to exercise jurisdiction over the merits of the economic substance issue, it is unclear that this proffer mandates a finding that the transactions lacked economic substance for purposes of assessing § 6621(c) interest. The partnership cases in which the Fifth Circuit has allowed such interest involve transactions that *on their face* lacked economic substance beyond tax avoidance at the time the taxpayer made the investment, or were cases in which the taxpayer did not contest the partnership's transactions' lack of economic substance.[19] The lack of economic substance of the partnership transaction in this case, *i.e.*, the economics apparent to the limited partner-investor, poses a different question. In any event, it is unnecessary for the Court to resolve these thorny jurisdictional and substantive issues. Weiner had the burden of proof at trial to show economic substance. He did not do so. Whether because the Court lacks jurisdiction, or because he completely failed to produce any evidence, Weiner cannot meet his burden on this issue.

The Court next turns to the issue of whether Weiner has proven he had a profit motive when he invested in the TFA partnership in 1984.

confirmed by Weiner's testimony at trial. Weiner testified that he knew § 6621(c) interest was not included in his settlement with the IRS, that he entered that agreement intending to contest the anticipated IRS assessment of that interest, and that, nevertheless, he did not attempt to participate in the Tax Court proceeding, which was still pending in 1997 when he settled with the IRS. Weiner chose instead to wait and seek a refund in district court where he would claim, in part, that the IRS could not assess § 6621(c) interest because the district court lacked jurisdiction over the partnership item of the economic substance of the partnership's transactions. This process highlights the difficulty presented by TEFRA in practice.

The IRS has filed a Notice of Supplemental Authority [Doc. #92] to bring to the Court's attention *Field v. United States*, No. 01 CIV.3000 SAS, 2002 WL 1300249 (S.D.N.Y. June 12, 2002). In *Field*, the district court held that the plaintiffs' suit for refund of interest paid under § 6621(c) raised no individualized claims that required partner-level adjudication. *Id.* at *5. The plaintiffs in *Field* had the right to join in the Tax Court proceeding and did not settle with the IRS. Because the Tax Court determined that the partnership's activities were tax-motivated, and the plaintiffs did not raise any partner-level defense to the imposition of the penalty interest, the plaintiffs' refund suit "founder[ed] on the shoals of the jurisdictional bar of I.R.C. § 7422(h)." *Id.* at *5. In contrast, in its Amended Memorandum Opinion, this Court concluded that it has jurisdiction to determine the § 6621(c) interest issue. That issue was not raised by the IRS at the bench trial on October 17, 2002. However, this Court has a continuing obligation to assess its jurisdiction. This Court concludes that the *Field* court's analysis is inapposite. Weiner settled his tax liability with the IRS. Also, unlike the plaintiffs in *Field*, Weiner asserts a partner-level defense to the imposition of § 6621(c) interest. Thus, the procedural quandary discussed above was not presented in *Field*.

19. *See Lukens*, 945 F.2d at 94 n. 2 (purchase of an ownership interest equal to one day's use of a vacation home at a price far in excess of its value, providing an interest deduction for years and including the ability to terminate the ownership interest without making the final balloon payment necessary to acquire title); *Chamberlain*, 66 F.3d at 731 n. 3 (taxpayers stipulated to the tax-motivated nature of transaction); *Durrett*, 71 F.3d at 517 (same). The Court notes that each of these cases was an appeal of a Tax Court decision in which the issue of the court's jurisdiction to decide the economic substance of the partnership transactions was not at issue.

### D. *Weiner's Individual Profit Motive*

■ The Fifth Circuit has not established a definitive list of factors to consider in making a determination of the individual taxpayer's profit motive. At minimum, the inquiry is whether the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction. *See Rice's Toyota World,* 752 F.2d at 91–92. The IRS contends that profit motive should be determined primarily by these objective factors, with less weight given to the taxpayer's subjective statement of his intent in investing in the partnership. *See Westbrook v. Commissioner,* 68 F.3d 868, 875 (5th Cir.1995) (citing standards for profit-motive inquiry under IRC § 183). The IRS further proposes that, if the Court finds Weiner's individual profit motive relevant, the factors to be considered are the purpose of the partnership; how the partnership was expected to provide a profit; the partner's understanding of the partnership program; the partner's reliance on upon others in investing in the partnership, and the background and experience on the persons relied upon; and the partner's sophistication.[20] The Fifth Circuit has recognized that profit motive is an inherently fact-based inquiry that will focus in large part on the credibility of the taxpayer. *See Durrett,* 71 F.3d at 517; *Chamberlain,* 66 F.3d at 732. The Court considers the objective factors identified by the IRS in making its determination.

Weiner testified at trial and called Lamont Grogan, his accountant, as his only other witness. The Court credits these witnesses' testimony. Grogan testified that he began working on Weiner's tax returns in 1983. At that time, Weiner had recently completed his residency and was beginning his practice as a physician. Grogan characterized Weiner as a novice investor at the time who had not made many investments. Over his years of working with Weiner, Grogan developed an opinion of him as careful, prudent, and thorough. Grogan has never known Weiner to invest in something solely because of the tax aspects of the investment.

When Weiner brought his records to Grogan for preparation of his 1984 tax returns, Grogan had "routine" concerns about the TFA investment. One of these routine concerns was whether the investment was expected to generate write-offs well in excess of Weiner's cash investment, which could indicate a tax-motivated investment. Grogan was satisfied that TFA was not such an investment. Grogan asked Weiner whether he was at risk in excess of his $40,000 cash investment because Weiner could claim a partnership loss only up to the amount he was at risk in the investment. The TFA losses shown on the partnership's K–1 for 1984 were $85,683. Weiner informed Grogan that he had signed a note for $66,000.[21] Surprisingly, Grogan did not do any independent due diligence to investigate the partnership or to confirm that Weiner was actually at risk for the $66,000 debt. Grogan prepared Weiner's 1984 individual tax return and included a deduction of $85,683 related to TFA. Grogan testified that this deduction resulted in a tax savings of approximately $42,000 in 1984. Over the years, Weiner declared approximately $45,000 in income from TFA and paid approximately $15,000–$20,000 in taxes on

---

**20.** The IRS gleans these factors from the underlying Tax Court decisions affirmed by the Fifth Circuit in *Chamberlain* and *Durrett.*

**21.** At trial, the assumption agreement (*i.e.,* the loan guaranty), Weiner signed revealed that

Weiner was at risk for only $44,000 of the TFA debt. His deduction for TFA losses in 1984 should have been limited to $84,000. This discrepancy has no bearing on the issues before the Court.

that income over the life of the investment.[22]

Weiner's own testimony confirms that his investment experience and financial sophistication were extremely limited in 1984. Weiner is a doctor of interventional radiology at the Methodist Hospital in Houston. He completed his residency in 1982 and began his private practice at Methodist in 1983. Prior to 1984 he had an IRA and bank accounts. In 1984, Weiner started getting cold-calls from investment advisors. He invested in an oil and gas deal on his own and realized he did not know what he was doing. He decided to obtain professional investment help. He interviewed several potential advisors before choosing Walter Sheffield as his financial planner. Weiner chose Sheffield in part because he was a fee-based service provider and Weiner thought his advice would be objective. Sheffield brought the TFA investment opportunity to Weiner. Weiner realized at the time that Sheffield would earn a commission on the investment, but did not place significance on this fact.

Weiner received the TFA prospectus, but did not read it in detail. He was working 50–60 hours per week plus periodic on-call duty. He relied on Sheffield's explanations and interpretation of the prospectus. Weiner had no experience in farming or grape growing. Weiner's understanding of the investment was that he would put in $40,000 in cash, sign a loan for $66,000 (now revealed to be $44,000), and that he was at risk if the crops failed. He understood that the money from the first year's crop sales was to be used to purchase land in Southern California on which to grow Travertine grapes. He believed—not unreasonably—that the land value

would appreciate, and that it could generate a capital gain when sold. Weiner understood that in the first year, he would receive a tax deduction for the partnership expenses to buy seed and grow the initial crops. Nothing in the prospectus indicated the farming would not occur. Weiner believed that the first-year crops' proceeds would be used to generate funds to purchase the specified or other suitable land. Weiner was not looking for immediate income and did not expect to see any profit from his investment for several years. It was his understanding that the partnership was projected to provide a 10% to 15% return on his investment after the vineyards matured. Weiner was aware that an entity called AMCOR would operate the partnership, but was not aware of its legal relationship to the TFA partnership. Sheffield told Weiner that the IRS had reviewed similar deals and confirmed his belief that this one was legal. Weiner subsequently invested in TFA and other AMCOR partnerships.

Weiner first learned of possible problems with the TFA partnership in the late 1980s when he read an article in the *Wall Street Journal* about the IRS's investigation of the AMCOR partnerships.[23] In approximately 1990, Weiner received a notice from the IRS about taxes and interest he owed. Grogan advised him to pay the assessment in order to prevent the accrual of interest. Eventually, Weiner agreed, on the advice of his counsel, to enter a settlement with the IRS.

Other than Sheffield, the September 17, 1984 "Confidential Private Placement Memorandum" (DX.2), which the parties call the prospectus, was the primary source of Weiner's information about the

---

22. The parties agreed that the income tax rates declined over the 11 or 12 years of the partnership.

23. By this time, Weiner had ended his relationship with Sheffield because he suggested to Weiner only limited partnerships and "load" mutual funds as investments.

partnership prior to his investment.[24] As the IRS pointed out at trial, careful analysis of the prospectus raises some red flags about the profit potential of the investment. The IRS's analysis requires financial acumen well above Weiner's abilities. The matters on which the IRS focuses are "red flags" for an investor's lack of profit motive only if the investor has experience in limited partnerships or true financial sophistication.[25]

Weiner testified that he saw the risk factors in the prospectus, but invested in the partnership anyway, in the hope of realizing income and capital gains over the long-term. He had more than enough income for his living needs, and expected to be in that situation for many years. He hoped to diversify his investments from merely stocks and bonds. He relied on his then-new investment advisor to achieve his goals. As for the warning regarding "profit motive" in the prospectus, he considered it much like a warning about the risks of a medical procedure: patients are warned of all potential risks, no matter how remote the likelihood of the risk actually occurring. This approach was understandable.

■ The IRS argues that even accepting the optimistic financial scenario expressed in the prospectus, the partnership would not yield a profit for the limited partners. The IRS argues that this is objective evidence that Weiner's investment was based solely on tax considerations. The Court disagrees. The IRS's analysis is based on detailed after-the-fact scrutiny by a knowledgeable tax attorney with a high level of expertise in limited partnerships and apparently sophisticated accounting staff. Weiner's motivation must be judged based on a reasonable review of what the prospectus disclosed, and what his advisor told him, at or about the time he made the TFA investment. As the Fifth Circuit stated in *Heasley:*

> [I]nvestors need not pore over every word in a prospectus or in closing documents. They exercise reasonable care by reading pertinent portions and having their advisors explain the rest. This rule particularly applies to unsophisticated investors, such as the Heasleys. In these cases, financial advisors, more

---

**24.** A "Preliminary Marketing Summary," DX 1, also existed, but Weiner does not specifically recall seeing it at the time he invested. At the Court's request, counsel has investigated the source of DX 1 and represents that it did not come from Weiner's or Grogan's files. *See* Plaintiff's Exhibit ("PX") 14. Thus, there is no proof that Weiner ever saw the document and it is not relevant to the determination of Weiner's individual profit motive.

**25.** For instance, the land to be purchased was "desert" land, making acquisition of water imperative if the land were to be used to grow grapes. However, the prospectus did identify a budget for this purpose. The prospectus includes under risk factors the caution that potential investors should evaluate the tax consequences of an investment, including the possibility that the limited partner's *pro rata* share of partnership losses may be disallowed for "profit motive" reasons. Weiner per-

ceives that the inclusion of "risk factors" is standard and a reader reasonably could construe the "profit motive" risk factor as a caution included to be comprehensive, but in fact only remotely likely to occur. Third, while cash distributions were to be 99% to limited partners and 1% to the general partner, on termination of the partnership, one third of the distributions would go to the general partner, reducing any ultimate profit distribution. However, this division seems favorable to the general partner but not unreasonable on its face. The IRS also points out that the *pro forma* financial statement included in the prospectus contains projections only through 1991, although the partnership term was represented to be twelve years. Again, given the uncertainties of projections and the many variables involved in the transaction, the absence of projections for the last four or five years of the partnership is not necessarily an indication of a lack of legitimacy.

than the investors, understand the advantages and disadvantages of particular investments and can explain them to investors.

902 F.2d at 386.

■ While Weiner was a highly educated doctor in 1984 when he invested in TFA, he was a novice investor with no business or financial training.[26] In the few years prior to 1984, Weiner earned from $13,000 to $26,000 as a resident and in a fellowship program. Weiner was the child of a single mother and had put himself through school. In 1984, having just joined a successful medical practice, Weiner recognized he would earn a skyrocketing salary over the foreseeable future. He admittedly was looking for ways to reduce his tax burden. But, he testified credibly that he thought of TFA as an investment with short-term tax advantages and the potential for future income, profit, and capital gains.[27]

The purpose of the TFA partnership as expressed in the prospectus was "to engage in the business of agriculture—principally growing crops on leased acreage in various locations and acquiring up to 500 acres of undeveloped desert agricultural land in Southern California's Coachella Valley, and developing those acres for production of Flame Seedless table grapes" for the "early (May–June) market." DX 2, at 1. The prospectus anticipated a 210% tax write-off in the first year due to the expenses associated with growing the initial crops on leased land. Weiner actually reported an approximately 214% write-off. Grogan testified that given the prevailing tax climate at the time, this was not a write-off percentage that raised concerns for him about the legitimacy of the investment, as he had seen deals with write-offs of five or six times the investment amount.[28] The IRS has presented no contrary evidence.

The prospectus reflected a highly risky investment, but it did not reveal "no reasonable possibility of profit" for the limited partners. See *Rice's Toyota World,* 752 F.2d at 91–92. The Court finds Weiner has met his burden to prove that his investment in TFA in 1984 was not intended solely to obtain tax benefits.[29] Thus, the

26. This distinguishes Weiner from the taxpayer in *Durrett,* 1994 WL 139382, 67 T.C.M. (CCH) 2735 (1994), who owned his own successful business buying and selling fuel oil, and in *Chamberlain v. Commissioner,* 1994 WL 199220, 67 T.C.M. (CCH) 2992 (1994), who had extensive experience buy and selling interests in various refineries. In *Lukens,* the plaintiff was one of the eighteen individuals who formed the partnership at issue. 945 F.2d at 94.

27. Weiner believed that after several years, his initial investment would generate income from the grape growing operations described in the prospectus, and would generate profit and capital gains upon the sale of the land. Weiner told Grogan in 1984 that he hoped to earn a profit from the eventual sale of the land purchased by the partnership to grow grapes. The evidence establishes that Weiner did not understand the detailed financial projections of the partnership, but he had a general understanding of the partnership program based on his limited review of the prospectus and his discussions with Sheffield. As to the details and reasonableness of the specifics of the investment, Weiner relied on Sheffield's opinion, a financial planning professional. While there is evidence that Weiner knew Sheffield would earn a commission on his investment, there is no evidence that Sheffield was working essentially as a promoter for AMCOR or was hawking this investment only to collect the commission without regard to its legitimacy. Even if that is the case, there is no evidence that Weiner knew it.

28. In *Lukens,* the taxpayer claimed a deduction approximately seven times his investment. 945 F.2d at 95.

29. Nothing in the prospectus revealed that the crops would never be planted at all or that key transactions would be merely "check swaps," as the IRS contends actually occurred. The IRS's contentions in this re-

objective evidence on which the IRS relies does not outweigh Weiner's credible testimony that he made his investment in TFA in 1984 with the hope of making money, albeit in a risky investment. A consideration of all relevant factors leads this Court to find that Weiner was not motivated solely by tax-avoidance and that he had a profit motive in making his 1984 investment in TFA.

## IV. CONCLUSION AND ORDER

The Court finds that the interest assessment by the IRS is not a "naked assessment" and therefore Weiner bears the burden of proof to establish that the assessment is incorrect. The Court further concludes that the imposition of § 6621(c) enhanced interest based on "sham transaction" requires both lack of economic substance of the partnership transactions and lack of profit motive on the part of Weiner. The Court finds that Weiner invested in the partnership with a profit motive and thus Weiner has met his burden to prove that he is entitled to a refund of the enhanced interest assessed against him pursuant to § 6621(c).

 "The IRS should not exact every penalty possible in every case where taxpayers pay less than the full amount of tax due." *Heasley,* 902 F.2d at 386. "Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." *Helvering v. Gregory,* 69 F.2d 809, 810 (2d Cir.1934) (Hand, J. Learned), *aff'd,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). It is therefore

**ORDERED** that Weiner is entitled to recover judgment against the IRS in the amount of $3,668.71 as a refund of enhanced interest erroneously assessed against him pursuant to § 6621(c). The Court will issue a separate final judgment

gard—made through a proffer—are based on *post hoc* investigation several years after Weiner's decision to invest. The IRS does not argue that Weiner knew or could have known about this potential fraud at the time he invested in TFA.